UNITED STATES *v.* EUROPEAN TRADING CO. (No. 4248)[1]

United States Court of Customs and Patent Appeals, February 26, 1940

*Webster J. Oliver,* Assistant Attorney General *(Samuel D. Spector,* special attorney, of counsel), for the United States.

*Lawrence & Tuttle (George R. Tuttle* of counsel) for appellee.

[Oral argument December 11, 1939, by Mr. Spector and Mr. Tuttle]

_____
[1] C. A. D. 103.

**290**

GARRETT, Presiding Judge, delivered the opinion of the court:

By appeal of the Government this case, involving two reappraisement proceedings (110259–A/2503 and 110260–A/2504) consolidated for trial, both relating to certain appraisals of the same type of merchandise made under the Antidumping Act, 1921, is before us for the second time.

By reference to *United States* v. *European Trading Co.*, 26 C. C. P. A. (Customs) 103, C. A. D. 1, it will be seen that the importer's appeals for reappraisement were tried before a single judge of the United States Customs Court and judgment rendered favorable to the importer; that the Government appealed; that the Second Division of that court sustained a motion by importer to dismiss the appeal (without considering the merits of the case) on the ground that it was not taken within the statutory period; that the Government appealed to this court and that we reversed the judgment of dismissal and remanded the case for determination upon its merits.

Following the remand, the Second Division considered the merits of the controversy upon the record formerly made up and rendered judgment affirming that of the single judge in favor of the importer. From that judgment the instant appeal was taken. The record in the former proceeding became a part of the record here, of course, and the factual statements, *infra*, are based upon that record.

The merchandise, of which there were two shipments, consists of galvanized wire fish trap netting, imported from Germany and entered at the port of Seattle, Wash., one shipment being entered in March 1934 and the other in April 1934. It was entered at the invoice price and appraised for *regular* duties on the basis of United States value as that value is defined in section 402 (e) of the Tariff Act of 1930. The entered and appraised values were the same except as to one item in reappraisement 110259–A in which there was an advance from the unit value which was consented to by the importer and is not here in dispute. The appraised values for the regular duties are not at issue.

The controversy relates only to appraisements made for the purpose of assessing special dumping duties in addition to the regular duties, there having been a finding of dumping by the Secretary of the Treasury respecting woven-wire fencing and wire netting imported from Germany, which finding was dated January 11, 1934 and published as T. D. 46826.

Section 202 (a) of the antidumping act reads:

[2] JACKSON, Judge, took no part in the consideration or decision of this case.

That in the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary has made public a finding as provided in section 201, and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, than the cost of production) there shall be levied, collected, and paid, in addition to the duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

The local appraiser found that the merchandise had no foreign-market value (and no export value) but held, upon the basis of a report of a United States Treasury representative, who made an investigation in Germany, at the request of the Seattle appraiser, that the purchase price (accepted as the United States value for the imposition of the regular duties with the exception noted) was less than the cost of production. Hence, appraisements for special dumping duties were made under section 206 of the antidumping act.

Section 203 of that act defines purchase price as follows:

Sec. 203. That for the purposes of this title, the purchase price of imported merchandise shall be the price at which such merchandise has been purchased or agreed to be purchased, prior to the time of exportation, by the person by whom or for whose account the merchandise is imported, plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, less the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States; and plus the amount, if not included in such price, of any export tax imposed by the country of exportation on the exportation of the merchandise to the United States; and plus the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States; and plus the amount of any taxes imposed in the country of exportation upon the manufacturer, producer, or seller, in respect to the manufacture, production or sale of the merchandise, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States.

Section 206 defines cost of production as follows:

Sec. 206. That for the purposes of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing, identical or substantially identical merchandise, at a time preceding the date of shipment of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of identical or substantially identical merchandise;

(3) The cost of all containers and coverings, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) equal to the profit which is ordinarily added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the same general trade as the manufacturer or producer of the particular merchandise under consideration.

It appears that the fish trap netting at issue was manufactured by a concern named in the record as Westfalische Drahtindustrie, which is located at Hamm, Germany, and that appellee is the manufacturer's exclusive American importer of it, the relations between the two, according to the report of the Treasury representative being "strictly that of seller and purchaser."

The materials used in the netting were wire and zinc for galvanizing the wire. The wire was made by drawing wire rods into wire. The rods were purchased by the manufacturer from Krupp's factories in Germany. The raw zinc (concerning which there is no issue here) was purchased from another German concern. The other elements which entered into the cost of production were the costs of labor, general overhead expenses, packing charges, freight, and profit. There is no issue as to any one of these latter elements, except that the amount of the profit item, being based upon percentage, is dependent upon the total sum found as the cost of production.

For making the netting involved in the two shipments, the manufacturer at Hamm purchased from Krupp 148,190 kilograms of wire rods (or rolled wire, as it is sometimes designated in the record), the amount actually paid therefor being 13,129.62 reichsmarks. This sum did not include 3,482.47 reichsmarks which were deducted from the price at which the rods seemingly were invoiced to the purchaser and which the Treasury representative referred to in his report as "an export rebate." The appraisal for regular duties having been upon the basis of United States value, as defined in section 402 (e) of the Tariff Act of 1930, neither the purchase price as defined in section 203 of the antidumping act, *supra*, nor the cost of production as defined in section 206 of the latter act, *supra*, entered into those appraisements, but when the appraiser appraised for the assessment of special dumping duties upon the basis of the cost of production, he added, or included, the 3,482.47 reichsmarks referred to as part of the cost of the rod portion of the raw materials thus making a total of 16,612.09 reichsmarks as the cost of the rods.

In the decision of the appellate division, the purchase prices and costs of production of the respective shipments are stated in terms of dollars and cents as follows:

In reappraisement 110259–A the purchase price was found to be $7,297.10 and the cost of production $8,286.64. In reappraisement 110260–A the purchase price was found to be $2,188.63 and the cost of production $2,475.77. This difference

between the purchase price and the cost of production is occasioned by the inclusion in the cost of production of 3,482.47 reichsmarks, which the appraiser found was a rebate or bounty granted to the manufacturer.

So, the specific issue is whether the 3,482.47 reichsmarks should be included in the cost of production as that term is defined in section 206 of the antidumping act, *supra.*

In his decision the single judge, *inter alia*, said:

After a thorough examination of the record I find that the crux of the whole matter is whether or not this rebate referred to in the special agent's report should have been included instead of being deducted. It will be observed that I am reappraising this merchandise as provided by the antidumping statute, and not according to the Tariff Act of 1930.

Rebate or no rebate, the fact remains that these wire rods *cost* the manufacturer 13,129.62 reichsmarks, and not 16,612.09 reichsmarks, as contended by the Government, and it is *actual costs* that I am considering in order to arrive at the cost of production.

In *Stirn* v. *United States*, 12 Ct. Cust. Appls. 42 at p. 46, T. D. 39981, the appellate court said it was the duty of the appraising board of the United States General Appraisers (now this court) to ascertain the *cost* of certain silk when it reached the hands of the manufacturer, as it was the material to be fabricated. So in the case at bar it is the duty of this court to find the cost of the wire rods used in the manufacture of the merchandise in question to the manufacturer. What was that cost? As shown by the special agent, it was not 16,612.09 reichsmarks, but the actual cost of the wire rods to the manufacturer, or what he really paid therefor, viz, 13,129.62 reichsmarks. Therefore, I am of opinion that the special agent properly deducted this rebate, and that the appraiser was in error in including it in the cost of production.

The appellate division declared:

As heretofore stated, the appraiser stated that he predicated his inclusion of the item of the export rebate amounting to 23.50 reichsmarks per ton of 1,000 kilograms in the cost of material and labor as a part of the cost of production on the theory that it was a bounty. If this item of export rebate is in fact a bounty or grant, then it would appear that this amount should have been levied, collected, and paid under the provisions of section 303 of the Tariff Act of 1930, "however the same be paid or bestowed." Irrespective, however, of whether or not this so-called export rebate was a bounty or grant in fact, we find from the record here that it was not actually included and paid as a part of the cost of production, and we therefore concur with the trial court in holding that the special agent properly deducted this rebate, and the appraiser was in error in including it in the cost of production.

Having concluded that this item of rebate was not and should not have been included in the cost of production, and since the cost of production exceeded the purchase price only by the inclusion of this item, it is clear that with this item eliminated from the cost of production the purchase price is not less than the cost of production, and no reason exists for levying dumping duties.

A summarization of the claims on behalf of the Government is stated in its brief (the italics being those of the brief) as follows:

1. The exporter in the case at bar, upon exportation of the merchandise received an export rebate of R. M. 23.50 per ton of 1,000 kg.

2. The lower court, in determining the cost of production should have added the above amount to the cost of production and then affirmed the assessment of dumping duty.

3. An export rebate applicable to any materials used in the manufacture of the exported article, inuring to the benefit of the exporter, manufacturer or producer *after* exportation, is not deductible from the cost of production figures. *Exportation* of the *completed* article is a condition precedent to receiving the rebate on the materials used in manufacturing the completed article.

4. A refund of a part of the purchase price on any of the materials used in the manufacture of the article, payable *after* proof of exportation of the completed article, is not properly deductible from the purchase price of the materials because it was not allowed at the time of purchase.

5. The appraiser was justified in his refusal to deduct the sum of R. M. 23.50 per ton of 1,000 kg., totalling R. M. 3,482.47, in computing the cost of production.

6. On the law, the judgment below should be reversed with directions to affirm the appraised values, or to dismiss importer's appeals for reappraisement.

In view of the contentions so made, we deem it proper to state certain facts shown by the record somewhat more in detail than they are stated in the decisions below, but it should be understood that in so doing we are not stating anything of a factual nature which differs from the findings of those tribunals, nor are we weighing the evidence. This being a reappraisement proceeding, we are confined to the determination of questions of law only and are bound by the findings of fact by the trial tribunal, provided there be any substantial evidence to support such findings.

The evidence material to the issues before us consists of two reports of a United States Treasury representative and an affidavit of one Heinrich Schürmann who stated that he held "the head office of the cost and calculating department" of the company which manufactured and exported the wire netting at issue.

It appears from both reports of the Treasury representative that the netting at issue was made to order for the United States importer. In the first report it was said:

My informants at Hamm stated that fish-trap netting was considered a specialty suitable only for the American market. Hence no offers or sales thereof, or of comparable merchandise, had been made to any purchaser, either in the German home market or in countries other than the United States.

In consequence of the foregoing a request was made concerning the cost of production of the instant merchandise, with the result that information was obtained as hereinafter mentioned.

In the second report, which seems to have been made in response to a request relating particularly to the item of profit, it is said:

According to information which I received from the Association of German Wire Manufacturers ("Drahtverband") at Duesseldorf, the Westfaelische Drahtindustrie at Hamm had been the only producer in Germany for the special type of netting sold. This grade of fish-trap netting is used exclusively in the United States, I was told, and same was made to order in accordance with specifications furnished by the U. S. importer for the salmon-fishing industry. I was unable

to obtain evidence from either the manufacturer at Hamm or from the manufacturer's association at Duesseldorf to the effect that wire netting of the same general character had been offered or sold to any purchaser during the current year, other than to the European Trading Co., Inc., of Seattle, Wash.

The statement relative to cost of the wire rods in the first report reads:

1. Cost of material  *  *  *:

Including an allowance for waste, a total of 148,190 kg of wire rods were purchased from Krupp, Essen. On the basis of the *1933 domestic price* for wire rods amounting to RM *112.10 per ton* of 1,000 kg, free Hamm, the actual cost of the instant raw material amounted to _____ RM 16, 612. 09

An *export rebate* amounting to RM *23.50 per ton* of 1,000 kg was allowed to the Hamm factory by Krupp, Essen, as verified by me from the latter's invoice covering the details of the transaction. The total rebate obtained amounts to_____ 3, 482. 47

Net cost of the raw material (wire rods) to the manufacturer at Hamm_____ RM 13, 129. 62

The only evidence of record respecting the so-called export rebate upon the *iron rods* is that contained in the "cost of material" statement quoted above from the first report of the Treasury representative. That report shows elsewhere that there was an "export allowance" of one-half of one percentum on the *wire netting* and that item appears to have been taken into account in the appraisement for regular duties. At any rate, it is not involved here.

We fail to find any evidence which supports the Government's contention above quoted to the effect that the exporter received an export rebate of RM 23.50 per ton of 1,000 kg *upon* exportation, or that the refund was "payable *after* proof of exportation of the completed article." The reports of the special agent make no statement as to the time of such allowances.

The affidavit of Schürmann contains the following statement:

The materials used in manufacture of this netting were mild steel wire rods and raw zinc. The process of manufacture consisted of pickling the wire rods, drawing them into wire, galvanizing the wire with zinc, and weaving it into netting. The total quantity of each material used in the manufacture of all of the merchandise shipped to the European Trading Company as aforesaid was 148,190 kilos of mild steel wire rods and 7,526 kilos of raw zinc. Each of said three lots shipped to the European Trading Co. was manufactured during the following periods of time:

470 rolls, in November 1933 and February 1934.
1,580 rolls, in November and December 1933.
100 rolls, in February 1934.

(b) Cost of materials: The mild steel wire rods were purchased from Fried. Krupp A. G., Friedrich-Alfred-Hutte, Rheinhausen, at RM. 8.86 per 100 kilos delivered free at Hamm (Westf.). These purchases were made from November

1933 to March 1934. The raw zinc was purchased from Metallgesellschaft, Frankfurt a. Main, at RM. 22 per 100 kilos. Both of these purchases were made in accordance with previous contracts.

(c) Payment: In regard to the wire rods the only condition as to payment was that cash be paid on the 15th of the month following delivery, and in respect to both the wire rods and the zinc, RM 8.86 and RM. 22 per 100 kilos, respectively, have been paid to the suppliers named above. The agreement covering the purchase of wire rods and other materials from Fried. Krupp A. G. is dated March 25, 1911, and provides for a base price of RM. 112.10 per 1,000 kilos. This price, however, is only a provisional one, and is subject to fluctuation depending upon general economic conditions. Accordingly, the actual price to be paid for such material varies. During the period of November 1933 to March 1934, the actual payment to Fried. Krupp A. G. for wire rods was RM. 8.86 per 100 kilos.

Elsewhere in the affidavit there is a quotation from the contract referred to in (b) above (and, as we understand it, also referred to in (c) above as being dated March 25, 1911), which reads:

Besides it is recognized as a rule that you [Westfälische Drahtindustrie] shall not be treated less favourable by us [Krupp] than any other party, i. e., that in no case you shall pay more for wire rods than any other buyer for the same material.

From all the foregoing it is clear that there is substantial evidence to support the finding of the trial court to the effect that the manufacturer of the wire netting actually paid only 13,129.62 reichsmarks for the iron rods from which the wire was drawn. . That was its actual cost to it, and there is no evidence of record that the manufacturer of this merchandise ever paid any more than this for wire rods to be used in the manufacture of identical or substantially identical merchandise. The cost of iron rods in Germany for purposes other than the manufacture of merchandise like that here involved is immaterial. According to the report of the Treasury representative Westfälische Drahtindustrie is the sole German manufacturer of this type of merchandise.

The Government insists, in effect, that, while the *finished netting* had no foreign value, the rods, *per se*, did have and that the *per se* foreign value of the rods, instead of their actual cost, must be taken as the element in determining the cost of production of the finished netting.

It would seem that to sustain the Government's position here would require the combining of the foreign-market value section (205) with the cost of production section (206) of the antidumping act. That is, it would require the foreign value of one of the materials (iron rods) to be determined and that value substituted for the actual cost of such iron rods in arriving at the cost of production of the completed netting. It is clear that under the statute this theory is untenable.

The antidumping act provides two bases for determining dumping duties, foreign-market value and cost of production, and each is independent of the other.

It is observed that the appellate division suggested that the countervailing duty provision of the Tariff Act of 1930 might have been found applicable to the merchandise. Upon this we express no opinion, but for purposes of comparison and in view of the Government's argument based upon the use of the phrase "export rebate" in the report of the Treasury representative, it is not amiss to direct attention to the fact that the antidumping act contains no express provision covering rebates, gratuities or grants, such as was provided in the countervailing duty provision of the Tariff Act of 1930. Incidentally, it may be said also that at the time of the passage of the antidumping act in 1921, the 1913 tariff act, which contained a countervailing duty provision (though not so far-reaching as that of the 1930 act) was in force and continued in force for sometime thereafter.

Whatever might have been the situation under the countervailing duty provision at the time of the importations here at issue, we are of opinion that the findings of fact below are supported by substantial evidence, and that no error of law was committed.

The judgment is *affirmed*.