# United States Court of Appeals for the Federal Circuit

_____

**SAHA THAI STEEL PIPE (PUBLIC) COMPANY LTD.,**

*Plaintiff-Appellant,*

v.

**UNITED STATES,**

*Defendant-Appellee,*

**and**

**ALLIED TUBE AND CONDUIT CORP.
AND WHEATLAND TUBE COMPANY**

*Defendants-Cross Appellants.*

_____

2010-1220, -1244

_____

Appeals from the United States Court of International Trade in consolidated case nos. 08-CV-0380 and 08-CV-0392, Senior Judge R. Kenton Musgrave.

_____

Decided: February 14, 2011

_____

KRISTINA MEDIC, O'Melveny & Meyers LLP, of Washington, DC, for the plaintiff-appellant. With him on the brief was GREGORY BRYAN.

JANE C. DEMPSEY, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for the defendant-appellee. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVISION, Director, and PATRICIA M. MCCARTHY, Assistant Director

ROGER B. SCHAGRIN, Schagrin Associates, of Washington, DC, for defendant-cross appellant.

---

Before BRYSON, DYK, and MOORE, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* DYK. Concurring opinion filed by *Circuit Judge* MOORE.

DYK, *Circuit Judge.*

In this antidumping case, plaintiff-appellant Saha Thai Steel Pipe (Public) Company Ltd. ("Saha") and defendants-cross appellants Allied Tube and Conduit Corp. and Wheatland Tube Company (collectively "domestic producers") appeal from a final judgment of the United States Court of International Trade ("Trade Court") which sustained a decision by the Department of Commerce ("Commerce"). Commerce (1) granted Saha a duty drawback adjustment, increasing its export price to reflect the implied cost of exempted import duties; and (2) included the exempted import duties in Saha's cost of production and constructed value. We affirm.

## BACKGROUND

This case concerns the final results issued by Commerce in its administrative review of an antidumping duty order covering carbon steel pipes from Thailand. *See Circular Welded Carbon Steel Pipes and Tubes from*

*Thailand: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 61,019 (Dep't of Commerce Oct. 15, 2008) (period of review: Mar. 1, 2006 – Feb. 28, 2007) [hereinafter *Final Results*]. Saha, the sole respondent in the administrative review, is a Thai producer of carbon steel pipes that exports its product to the United States. The domestic producers are interested U.S. manufacturers.

I

Understanding the nature of the issues in this case requires a brief overview of certain aspects of antidumping law, as defined by the Tariff Act of 1930.

Dumping occurs when a foreign firm sells a product in the United States at an export price ("EP") that is lower than the product's normal value ("NV"); the amount by which NV exceeds EP is the dumping margin. *See* 19 U.S.C. § 1673. For exporters based in market economy countries such as Thailand, NV is generally calculated to be "the price at which the foreign like product is first sold . . . for consumption in the exporting country . . . ." 19 U.S.C. § 1677b(a)(1)(B)(i). However, in determining that sale price, Commerce may disregard sales made at less than the manufacturer's cost of production ("COP"). *Id.* § 1677b(b)(1). If no sales in the exporting country remain after disregarding sales below COP, then Commerce will alternatively base NV on the constructed value ("CV") of the merchandise. *Id.* § 1677b(b)(1). COP and CV are closely related. The major components of COP are (1) the cost of manufacture; (2) "selling, general, and administrative expenses"; and (3) packaging expenses. *Id.* § 1677b(b)(3). CV generally includes the same or similar elements as COP, but with the additional component of profit. *Id.* § 1677b(e).

Commerce determines a respondent's dumping margin by calculating the amount by which NV exceeds EP. Commerce generally calculates EP to be the price at which the subject merchandise is first sold to an unaffiliated purchaser in the United States, subject to several possible adjustments. 19 U.S.C. § 1677a. At issue in this case is what is known as the "duty drawback adjustment." The statute provides that EP "shall be . . . increased by . . . the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States . . . ." *Id.* § 1677a(c)(1)(B). In other words, if a foreign country would normally impose an import duty on an input used to manufacture the subject merchandise, but offers a rebate or exemption from the duty if the input is exported to the United States, then Commerce will increase EP to account for the rebated or unpaid import duty (the "duty drawback").

The purpose of the duty drawback adjustment is to account for the fact that the producers remain subject to the import duty when they sell the subject merchandise domestically, which increases home market sales prices and thereby increases NV. That is, when a duty drawback is granted only for exported inputs, the cost of the duty is reflected in NV but not in EP. The statute corrects this imbalance, which could otherwise lead to an inaccurately high dumping margin, by increasing EP to the level it likely would be absent the duty drawback. *See Hornos Electricos de Venezuela v. United States*, 285 F. Supp. 2d 1353, 1358 (Ct. Int'l Trade 2003); *see also* S. Rep. No. 67-16, at 12 (1921) ("In order that any drawback given by the country of exportation upon the exportation of merchandise shall not constitute dumping, it is necessary also to add such items to the purchase price.").

## II

Saha manufactures carbon steel pipe in Thailand using inputs of hot-rolled steel coil and zinc that it imports into Thailand. The Thai government normally imposes import duties on hot-rolled steel coil (5%) and zinc (3.25%). However, since 1997, Saha has participated in Thailand's bonded warehouse program under which imported materials that are incorporated into final products to be exported are exempt from import duties. Under this program, a manufacturer that imports and stores goods in an approved bonded warehouse need not pay any import duties at the time of entry into Thailand. The duty exemptions become permanent if the manufacturer exports the imported materials—incorporated into finished products or otherwise—within one year.

In the administrative review here, Commerce determined that Saha received duty exemptions under Thailand's bonded warehouse program for its inputs of hot-rolled steel coil and zinc that Saha incorporated into the carbon steel pipes it exported to the United States. *See Final Results* at 61019 (adopting *Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 73 ITADOC 61019, 2008 WL 4619781 (Oct. 6, 2008), *available at* http://ia.ita.doc.gov/frn/summary/thailand/E8-24481-1.pdf [hereinafter *I & D Memorandum*]); *I & D Memorandum* at 3–4. Commerce accordingly granted Saha a duty drawback adjustment pursuant to 19 U.S.C. § 1677a(c)(1)(B) and increased Saha's EP to account for the unpaid duty. *Final Results* at 6,1019–20; *I & D Memorandum* at 3-7. In calculating the adjustment, Commerce used Saha's actual yield factors (the input amounts of hot-rolled steel and zinc used to manufacture

each unit of carbon steel pipe, the subject merchandise). *Final Results* at 6,1019–20; *I & D Memorandum* at 10–11.

In addition to increasing EP, Commerce included the exempted import duties in Saha's cost of manufacture, thereby increasing both Saha's COP and CV. *Final Results* at 6,1019–20; *I & D Memorandum* at 14–16. In deciding to include the exempted import duties in COP and CV, Commerce reasoned that, "since we are adjusting EP for the duty exemption, we must account for the related duties that would have been incurred on [Saha's] imported inputs." *I & D Memorandum* at 14. Moreover, because of its policy of calculating a single COP both for exported and domestically sold products, and because there were no duty exemptions for the inputs of carbon steel pipe sold in Thailand, Commerce reasoned that the cost of the exempted duties should be included in Saha's cost of manufacture. *Id.*

## III

Both Saha and the domestic producers challenged Commerce's final results in the Trade Court. The domestic producers contended that Commerce erred in granting a duty drawback adjustment—thereby raising Saha's EP—to account for exempted import duties that Saha never actually paid. Saha argued that Commerce properly raised its EP, but erred in including the exempted import duties in its COP and CV. Saha additionally challenged Commerce's application of Saha's actual yield factors when calculating the drawback adjustment instead of the yield factors established by the Thai government.

The Trade Court sustained Commerce's decision in all respects save for the yield factor issue, and it remanded to Commerce for recalculation of the dumping margin using the yield factors established by the Thai government. *See*

*Saha Thai Steel Pipe (Public) Co. Ltd. v. United States*,
No. 08-00380, Slip Op. 09-116, 2009 WL 3326637 (Ct. Int'l
Trade Oct. 15, 2009). Saha does not contest the yield
factor issue in the present appeal. On remand, Commerce
reduced Saha's dumping margin from 4.26 percent to 4.21
percent. Joint App. 755. The Trade Court thereafter
sustained Commerce's remand redetermination and
entered a final judgment. *See Saha Thai Steel Pipe
(Public) Co. Ltd. v. United States*, No. 08-00380, slip op.
10-1, 2010 WL 9417 (Ct. Int'l Trade Jan. 4, 2010). Saha
and the domestic producers each filed timely appeals,
which have been consolidated. We have jurisdiction
pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

In reviewing the Trade Court's decision to affirm
Commerce's final determination, we apply anew the
Trade Court's standard of review; thus, we will "uphold
Commerce's determination unless it is 'unsupported by
substantial evidence on the record, or otherwise not in
accordance with law.'" *Micron Tech., Inc. v. United
States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997) (quoting 19
U.S.C. § 1516a(b)(1)(B)(i)).

## I

We first address the domestic producers' contention
that Commerce erred in granting Saha a duty drawback
adjustment. In determining whether a duty drawback
adjustment is warranted, Commerce applies a two-
pronged test under which the respondent is required to
demonstrate:

> (1) that the rebate and import duties are depend-
> ent upon one another, or in the context of an ex-
> emption from import duties, that the exemption is
> linked to the exportation of the subject merchan-

dise, and (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise.

*Saha Thai*, 2009 WL 3326637 at *1; *see also Allied Tube & Conduit Corp. v. United States*, 374 F. Supp. 2d 1257, 1261 (Ct. Int'l Trade 2005). Here, Commerce found that Saha met both requirements for its two-pronged test. *See I & D Memorandum* at 4. The domestic producers do not dispute that finding. *See* Cross Appellants' Br. 13–16. Rather, the domestic producers contend that Commerce's two-pronged test is unlawful. The governing statute is 19 U.S.C. § 1677a(c)(1)(B), which provides that EP shall be increased by

the amount of any import duties *imposed by the country of exportation* which have been rebated, *or which have not been collected*, by reason of the exportation of the subject merchandise to the United States.

19 U.S.C. § 1677a(c)(1)(B) (emphases added). The domestic producers argue that Commerce may only increase EP when import duties are "imposed by the country of exportation" and then later rebated upon exportation of the subject merchandise. Because inputs imported and stored in Saha's bonded warehouse received an exemption from import duties upon entry into Thailand rather than a post-duty rebate, the domestic producers contend that no import duties were ever actually "imposed" on Saha as required by the statute.

However, on its face, § 1677a(c)(1)(B) expressly contemplates the application of duty drawback adjustments where, as here, import duties "have not been collected." To be sure, the statute cannot apply in circumstances in which the home country had no provision for the imposition of import duties on materials used to provide the

exported merchandise. Under such circumstances, the mere fact that duties "have not been collected" would not entitle the exporter to a rebate. But the domestic producers' out-of-context focus on the word "imposed" cannot read the words "have not been collected" out of the statute. When read as a whole, the statute defines a plain and simple rule: a duty drawback adjustment shall be granted when, but for the exportation of the subject merchandise to the United States, the manufacturer would have shouldered the cost of an import duty. Even if the statute were ambiguous, we are required to afford *Chevron* deference to Commerce's interpretations of the statute. *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379–80 (Fed. Cir. 2001). Commerce's longstanding interpretation of the statute as applying to duty exemptions constitutes a reasonable interpretation.

Here, the domestic producers admit that Saha would have been required to pay import duties had it sold its carbon steel pipe in Thailand rather than exporting it to the United States. Cross Appellants' Br. 14 (acknowledging that Saha's import duty "exemption is expressly conditioned upon the release of the subject merchandise processed in the duty free warehouse for shipment to export markets"). This case thus presents the precise circumstances that the statute, as interpreted by Commerce, is intended to address—where goods sold in the exporter's domestic market are subject to import duties while exported goods are not.

We have considered the domestic producers' remaining arguments as to this issue and find them to be without merit. Accordingly, we find that Commerce did not err in granting Saha a duty drawback adjustment and raising its EP to account for import duties that were

exempted due to the exportation of the subject merchandise to the United States.

## II

The domestic producers agree with Commerce's decision that, if the cost of the exempted duties is added to EP, a corresponding adjustment (increase) must be made to COP and CV. Curiously, in the past Commerce has not made such an adjustment, changing its longstanding policy only in the present case.[1] Saha contends that this change is both contrary to the statute and arbitrary and capricious. Saha contends that the inclusion of exempted import duties in COP improperly increased NV—and therefore its dumping margin—because the inflated COP caused additional home market sales to be excluded from the NV calculation for falling below COP. Ironically, like the domestic producers, the gravamen of Saha's claim rests on the fact that Saha received import duty exemptions rather than post-duty rebates. Because Saha never actually paid import duties on goods stored in its bonded warehouse, Saha contends that costs associated with these exempted duties were merely "fictitious" and as such were not reflected in its books and records. Under these circumstances, Saha argues, the exempted import duties should have been excluded from its cost of manufacture.

---

[1] Commerce attempts to argue that its inclusion of exempted import duties in Saha's COP and CV was consistent with its prior practice, citing a handful of unrelated cases for support. Appellee's Br. 31–32. However, the government does not dispute that the present administrative review was the first time in nearly twenty years of proceedings involving Saha that Commerce included exempted import duties in Saha's COP and CV. *See* Appellant's Br. 9, n.2.

The antidumping statute directs that, in calculating COP and CV, the cost of manufacture shall include "the cost of materials and of fabrication or other processing of any kind" used to produce the product. 19 U.S.C. § 1677b(b)(3), (e)(1). The statute further explains that such "[c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles [GAAP] of the exporting country . . . and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). Saha contends that, because its books adhered to Thailand's GAAP and did not record unpaid import duties as a cost, Commerce erred in including them in its COP and CV calculations. The government argues that deviation from Saha's books was proper in this case because Saha's records did not "reasonably reflect [its] costs" as required by § 1677b(f)(1)(A). The inclusion of the exempted import duties was necessary, the government contends, because failure to do so would have unfairly distorted the dumping margin in Saha's favor. Indeed, this court has recognized that Commerce has the discretion to diverge from a company's books and records when necessary to calculate an accurate dumping margin.[2]

We find that § 1677b(b)(3), (e)(1), and (f)(1)(A) are ambiguous as to whether "costs" may include "implied" costs in addition to "actual" costs. We must therefore

---

[2] *See Thai Pineapple Public Co., Ltd. v. United States*, 187 F.3d 1362, 1367 (Fed. Cir. 1999) (noting that, "if the records are not reasonably reflective of cost, Commerce may deviate from them"); *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1206 (Fed. Cir. 1995) (holding that Commerce "may reject [a company's] records if accepting them would distort the company's true costs").

defer to Commerce's interpretation of the statute if it is based on a permissible construction. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). As we now discuss, we find that Commerce reasonably interpreted these subsections. The fact that Commerce changed its policy is irrelevant, as Commerce is entitled to change its views, and a new administrative policy based on a reasonable statutory interpretation is nonetheless entitled to *Chevron* deference. *Rust v. Sullivan*, 500 U.S. 173, 186–87 (1991).

The government determined that adding exempted import duties to EP without also including the exempted duties in COP and CV could have unfairly distorted the dumping margin in Saha's favor. In Commerce's view, it should follow the "matching principle" in making such calculations, which is the basic accounting practice whereby expenses are matched with benefits derived from them. *See Live Swine From Canada*, 70 Fed. Reg. 12,181 (Dep't of Commerce Mar. 11, 2005), and accompanying Issues and Decision Memorandum, at cmt. 57. We agree that Commerce reasonably decided that any increase to EP pursuant to a duty drawback adjustment should be accompanied by a corresponding increase to COP and CV. As discussed above, the entire purpose of increasing EP is to account for the fact that the import duty costs are reflected in NV (home market sales prices) but not in EP (sales prices in the United States). An import duty exemption granted only for exported merchandise has no effect on home market sales prices, so the duty exemption should have no effect on NV. Thus, because COP and CV are used in the NV calculation, COP and CV should be calculated as if there had been no import duty exemption. It would be illogical to increase EP to account for import duties that are purportedly reflected in NV, while simultaneously calculating NV based on a COP and CV that do

not reflect those import duties. Under the "matching principle," EP, COP, and CV should be increased together, or not at all.[3]

Saha argues that even if the matching principle requires including the exempted import duties in COP, Commerce nonetheless erred in this case by effectively "double counting" the import duty costs. In calculating COP, Commerce calculates a single cost of production utilizing data for the costs of domestic production together with the costs of export production. *See Magnesium Metal from the Russian Federation*, 70 Fed. Reg. 9,041 (Dep't of Commerce Feb. 24, 2005), and accompanying Issues and Decision Memorandum, at cmt. 20. Saha argues that,

> [i]f imported steel is used to make a product that is sold in the home market, then there is no duty exemption or duty drawback granted. The reported hot-rolled coil costs include all of the actual duties paid on imports. Therefore, to add a theoretical duty amount to the cost that includes the actual duties paid would artificially inflate [COP].
> . . .
>
> . . . If the local producers are price takers . . . then their domestic prices will exceed the world market price for steel by the amount of the duty

---

[3]  Saha cites *United States v. European Trading*, 27 C.C.P.A. 289 (1940), for the proposition that only "actual costs" may be included in COP. In *European Trading*—a customs valuation case—the court found that the cost of an "export rebate" should not be included in the exporter's cost of production, which the court concluded was limited to actual costs. *Id.* at 293. However, *European Trading* did not address the specific issue of whether failure to include such costs would distort the dumping margin when EP is increased pursuant to a duty drawback adjustment.

> protection.  In other words, the domestic price of hot-rolled steel effectively "captures" the cost of the duty. . . . By adding in the "exempted" duties into the cost of coil that already includes the higher home market hot-rolled coil cost, [Commerce] has, in essence, double-counted the import duty impact on [Saha's] coil cost.

Appellant's Br. 38–39.  In other words, Saha contends that Commerce (1) applied an imputed import duty to the cost of imported inputs sold in Thailand (on which import duties had already actually been paid); and (2) applied an imputed import duty to the cost of inputs purchased in Thailand (which are never subject to import duties).  We ordered supplemental briefing on this issue on December 29, 2010, and the parties submitted their briefs on January 13, 2010.

After reviewing the parties' supplemental briefs, we find that Commerce's calculation methods were appropriate.  In view of Commerce's policy of calculating a single average COP value "which incorporates the cost of producing both exported and domestically sold finished products," Appellee's Br. 23, Commerce calculated Saha's average per-unit steel coil input cost by starting with the total cost of *all* of Saha's steel coil inputs consumed.  This included (A) steel coil inputs purchased in Thailand (which were not subject to import duties); (B) imported steel coil inputs sold in Thailand (on which import duties had actually been paid); and (C) steel coil inputs imported under Thailand's bonded warehouse program and exported to the United States (which received import duty exemptions).  To appropriately account for category C's import duty exemptions, Commerce calculated an adjustment factor that it applied to the average per-unit cost for

all of Saha's inputs. Saha argues that the application of an adjustment factor to the inputs in categories A (domestic purchases) and B (imports sold domestically) resulted in double counting of import duty costs. However, this is inaccurate, as Saha fails to recognize that the calculation employed by Commerce, while perhaps not intuitive, is mathematically equivalent to simply adding the import duties exempted for category C (bonded warehouse imports) to the total cost of Saha's inputs before computing the average per-unit cost.

Thus, it is clear that Commerce only added imputed import duty costs to COP in an amount appropriate to offset Saha's actual import duty exemptions under the bonded warehouse program. This did not result in double counting because Commerce merely added the cost of import duties that Saha would have paid on the inputs in category C if Saha had sold the subject merchandise in Thailand rather than exporting it to the United States. Commerce thus calculated an appropriate average COP for the comparison to the home market prices which—as Saha itself notes—reflected the costs of the import duties.

We have considered Saha's remaining arguments and find them to be without merit. Accordingly, we find that Commerce's interpretation of § 1677b was a permissible construction of the statute that is deserving of *Chevron* deference. As such, Commerce did not err in including the exempted import duties in Saha's cost of manufacture when calculating COP and CV.

## CONCLUSION

We find that Commerce did not err in (1) granting Saha a duty drawback adjustment and increasing its EP to reflect the implied cost of exempted import duties, and (2) including the imputed cost of the exempted import duties in Saha's cost of manufacture when calculating

COP and CV. Accordingly, we affirm the Trade Court's decision sustaining Commerce's final results.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**SAHA THAI STEEL PIPE (PUBLIC) COMPANY LTD.,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee,*

**and**

**ALLIED TUBE AND CONDUIT CORP. AND WHEATLAND TUBE COMPANY**
*Defendants-Cross Appellants.*

---

2010-1220, -1244

---

Appeals from the United States Court of International Trade in consolidated case Nos. 08-CV-0380 and 08-CV-0392, Senior Judge R. Kenton Musgrave.

---

MOORE, *Circuit Judge*, concurring.

I join the majority in all respects, but one. I do not agree that the plain language of the duty drawback statute encompasses import duties that have *never* been

imposed. The statute requires export price to be increased by

> the amount of any import *duties imposed* by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States.

19 U.S.C. § 1677a(c)(1)(B) (emphasis added). The debate centers on whether the statutory language "duties imposed" is a requirement only for duties which "have been rebated" or also applies to duties which "have not been collected." I find the statutory language on this point ambiguous. Applying *Chevron* deference, for the reasons stated in the majority, I find Commerce's interpretation of the statute is based on a permissible construction. *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).