Slip Op. 10-53

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| QINGDAO TAIFA GROUP CO., LTD., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Before: Jane A. Restani, Chief Judge |
| | : | |
| UNITED STATES, | : | Court No. 08-00245 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| GLEASON INDUSTRIAL PRODUCTS, INC. | : | |
| and PRECISION PRODUCTS, INC., | : | |
| | : | |
| Defendant-Intervenors. | : | |

## OPINION

[Department of Commerce's remand results remanded for proper investigation and analysis regarding government control of plaintiff.]

Dated: May 12, 2010

Adduci, Mastriani & Schaumberg, LLP (Louis S. Mastriani and William C. Sjoberg) for the plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini); Thomas M. Beline, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for the defendant.

Crowell & Moring LLP (Matthew P. Jaffe and Alexander H. Schaefer) for the defendant-intervenors.

Restani, Chief Judge: Plaintiff Qingdao Taifa Group Co., Ltd. ("Taifa")

challenged the final results of an administrative review of the antidumping duty order on hand

trucks and certain parts thereof from the People's Republic of China ("PRC"), which assigned

Taifa the PRC-wide dumping margin of 383.60% based on total adverse facts available ("AFA").
See Hand Trucks and Certain Parts Thereof from the People's Republic of China; Final Results
of 2005-2006 Administrative Review, 73 Fed. Reg. 43,684 (Dep't Commerce July 28, 2008)
("Final Results"). Following initial briefing and oral argument, the court granted in part and
denied in part Taifa's motion for judgment on the agency record and remanded the matter to the
United States Department of Commerce ("Commerce") to determine whether a government
entity exercised nonmarket control over Taifa sufficient to link the PRC-wide rate to Taifa and to
calculate a separate, substitute AFA rate if the PRC-wide were not warranted. Qingdao Taifa
Group Co. v. United States, 637 F. Supp. 2d 1231 (CIT 2009) ("Taifa I"). The court now reviews
Commerce's Final Results of Redetermination Pursuant to Court Remand (Dep't Commerce Jan.
22, 2010) (Docket No. 100) ("Remand Results"). For the reasons stated below, the court
remands the matter to Commerce again.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). The court will uphold
Commerce's final determination in an antidumping review unless it is "unsupported by
substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.
§ 1516a(b)(1)(B)(i).

## BACKGROUND

In February 2007, Commerce initiated an administrative review of the
antidumping duty order on hand trucks and certain parts thereof from the PRC with respect to
Taifa for the period December 1, 2005, through November 30, 2006. Initiation of Antidumping
and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 72 Fed.

Reg. 5005 (Dep't Commerce Feb. 2, 2007). Taifa submitted a separate rate certification and

responses to Commerce's questionnaires stating that the government did not control or own any

interest in Taifa. (See App. of Docs. in Supp. of Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for

J. on the Agency R. Tab 1; Def.'s App. 13; Def.-Intervenors' App. to Mem. of P. & A. in Opp'n

to Pl.'s Mot. for J. on the Agency R. Tab 3, at 2–3.) Taifa also stated in its questionnaire

responses that it did not sell wheels with its hand trucks. (See Def.'s App. 41, 56.) Commerce's

Preliminary Results, issued in January 2008, applied an individual weighted-average dumping

margin of 3.82% for Taifa, while the PRC-wide rate was 383.60%. Hand Trucks and Certain

Parts Thereof from the People's Republic of China; Preliminary Results, Partial Intent to

Rescind and Partial Rescission of the 2005-06 Administrative Review, 73 Fed. Reg. 2214, 2222

(Dep't Commerce Jan. 14, 2008) ("Preliminary Results").

Commerce conducted verification of Taifa in April 2008 and issued its

verification report in June 2008. (Def.'s App. 81.) According to the report, Commerce found

production notices for subject merchandise that referenced wheels, and a Taifa manager admitted

that Taifa sold hand trucks and wheels together but did not attach the wheels to avoid

antidumping duties. (See id. at 93.) The report also indicated that Taifa officials misrepresented

that they had destroyed Taifa's production notices and factory-out slips and that Taifa employees

attempted to remove and hide pages from the current production subledger. (Id. at 91–93.)

The report further stated that some documents indicated that a collective called

Qingdao Taifa Group Co. owned a majority of Taifa's shares, but other documents indicated that

the Yinzhu Town Government owned those shares. (Id. at 83–87.) Specifically, Commerce

found that a Capital Verification Report, Application for Registration of the Company's

Establishment, Circular of Jiaonan City State Assets Management Bureau: Approval of Equity

Settlement for Preparing to set up Qingdao Taifa Group Co., Ltd., and Certification by the

Jiaonan City Yinzhu Town People's Government, all dated 1997, list the Yinzhu Town People's

Government as the holder of 51.42% or 18 million shares of Taifa's stock.  (Id. at 84–87.)  All

other documents identified the collective Qingdao Taifa Group Co. as the owner of those shares.

(See id. at 87.)  Commerce's verification report also found that documents reflecting a 2003

transfer of the majority interest to other individuals, a 2003 Shares Transfer Agreement and

Taifa's 2003 Articles of Association, were not registered with the proper Chinese authorities.[1]

(Id. at 85–86.)   Commerce found no other evidence of government control.  (Id. at 88–89.)

In its July 2008 Final Results, Commerce determined that Taifa failed to

cooperate with the review, applied total AFA, denied Taifa a separate rate, and assigned Taifa

the PRC-wide margin of 383.60%.  Final Results, 73 Fed. Reg. at 43,686–88.  Taifa challenged

the Final Results.

In Taifa I, the court concluded that AFA was appropriate for all of the facts

relevant to Taifa's sales and factors of production data based on Taifa's failure to report data

relating to wheels shipped with its hand trucks and Taifa's conduct at verification.  637 F. Supp.

2d at 1238–40.  The court, however, held that Commerce could not apply AFA to conclude that

Taifa was government-controlled because the mere evidence that the town government had an

ownership interest in Taifa, without any additional evidence of or explanation about why there

was a finding of government control, was insufficient to support the application of the PRC-wide

---

[1] The  2003 Articles of Association also lacked the seals of some of Taifa's shareholders.
(See id. at 85.)

rate as the AFA rate. Id. at 1240–44. Because Commerce never made a final factual

determination about the presence or absence of government control over Taifa, the court

remanded for a proper analysis of government control, instructing Commerce "to determine

whether a government entity exercised de facto nonmarket control over Taifa sufficient to link

the China entity rate to Taifa" and to "calculate a separate, substitute AFA rate" if the PRC-wide

was not warranted. Id. at 1244.

On remand, Commerce concluded that it could not affirmatively demonstrate that

a government entity exercised control over Taifa and calculated a 227.73% separate AFA rate

for Taifa. Remand Results at 3. Following remand, defendant-intervenors Gleason Industrial

Products, Inc. ("Gleason") and Precision Products, Inc. ("Precision") challenge Commerce's

conclusion that Taifa is entitled to a separate rate. (Gleason and Precision's Comments on Final

Results of Redetermination Pursuant to Court Remand 2–11.) Taifa asserts that Commerce

misinterpreted the court's remand instructions as shifting the burden of proving entitlement to a

separate rate away from Taifa, but Taifa agrees with Commerce's determination that Taifa is

entitled to a separate rate. (Taifa's Comments on Final Redetermination on Remand 2–4.) Taifa

also challenges the 227.73% AFA rate. (Id. at 5–23).

## DISCUSSION

Commerce misconstrued the remand instructions as requiring Commerce "to

affirmatively demonstrate" that a government entity exercised de facto control over Taifa before

it could apply the PRC-wide rate to Taifa and as shifting the burden of proof away from a

respondent claiming a separate rate. Remand Results at 4. The court did not address the

strength or effect of Commerce's presumption of government control for a respondent in a

nonmarket economy ("NME") country or for the PRC in particular. Taifa I, 637 F. Supp. 2d at 1240 n.6.[2]

Under this presumption, a respondent receives the NME country-wide rate, rather than a separate, company-specific rate, unless it affirmatively demonstrates an absence of central government control, both de jure and de facto, with respect to exports. See Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997). Evidence of absence of de jure government control "includes: (1) [a]n absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; or (3) any other formal measures by the government decentralizing control of companies." Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China, 56 Fed. Reg. 20,588, 20,589 (Dep't Commerce May 6, 1991); see also Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States, 44 F. Supp. 2d 229, 242 (CIT 1999) ("Brake Drum"). Evidence of absence of de facto government control includes whether: (1) "each exporter sets its own export prices independently of the government and other exporters;" (2) "each exporter can keep the proceeds from its sales;" (3) "the Respondent has authority to negotiate and sign contracts and other agreements;" and (4) "the Respondent has autonomy from the government in making decisions regarding the selection of management." Brake Drum, 44 F. Supp. 2d at 243 (citing Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China, 59 Fed. Reg.

---

[2] The foreign and domestic interests, which agree on nothing else, agree that Commerce misconstrued the court's remand order. The particular manner of "complying" with the court's remand order has given, at least, the appearance of unwillingness to attempt to comply with the order in a reasonable way. This appearance should be avoided.

22,585, 22,587 (Dep't Commerce May 2, 1994)).

       The problem in this case is that it appears that Taifa presented Commerce with information that may rebut the NME presumption. Commerce preliminarily found that Taifa had presented statements and documentation satisfying each form of evidence of absence of de jure and de facto government control. Preliminary Results, 73 Fed. Reg. at 2219. Commerce's Preliminary Results therefore found that Taifa demonstrated an absence of de jure and de facto government control. Id. Commerce's verification report also "noted no indication of government control." (Def.'s App. 88.) Nevertheless, Commerce's Final Results applied the PRC-wide rate as AFA because Commerce could not verify certain documents regarding Taifa's ownership structure. See 73 Fed. Reg. at 43,686; Issues and Decision Memorandum for the Antidumping Duty Administrative Review of Hand Trucks and Certain Parts Thereof from the People's Republic of China, A-570-891, POR 12/01/2005-11/30/2006, at 4 (July 14, 2008), Admin R. Pub. Doc. 96, available at Def's App. 102.

       Without any further information, the only adverse inference that might be drawn from the discrepancies in these documents is that the town government owned a majority interest in Taifa, which may have been in transition to ownership by private individuals. As the court previously held, although "local government ownership is of some limited relevance," Taifa I, 637 F. Supp. 2d at 1242, the central inquiry is whether a government entity exercised nonmarket control over Taifa's prices, export activities, or operations sufficient to link Taifa to a country-wide rate, id. at 1243–44. Commerce has also repeatedly stated that ownership is not dispositive and is not a basis for denying separate rate status. See id. at 1242–43 (citing Commerce documents). Accordingly, Commerce's decision to apply the PRC-wide rate as AFA on the

issue of government control where there was merely evidence of possible town government ownership was not supported by substantial evidence or in accordance with law.  Id. at 1242–44; cf. East Sea Seafoods LLC v. United States, Slip Op. 10-42, 2010 WL 1644029, at *16 (CIT Apr. 19, 2010) ("Commerce's application of the presumption of state control, without considering abundant record evidence rebutting that very presumption, pushed legal fiction into the realm of legal fantasy.  Doing so was not in accordance with law.").

The PRC-wide rate, however, may be appropriate in this case, but Commerce must make a factual determination explaining why the PRC-wide rate is or is not appropriate. Commerce cannot conclude that the PRC-wide rate is not appropriate for Taifa without proper analysis or explanation, just as Commerce cannot use the presumption of government control for a respondent in an NME country as "an excuse for inadequate investigation and assessment." Taifa I, 637 F. Supp. 2d at 1240 n.6; see also East Sea Seafoods, 2010 WL 1644029, at *15 (finding unlawful Commerce's decision to assign the respondent the NME country-wide rate without first considering evidence on the record that specifically addresses the extent to which the respondent is de facto and de jure independent from the NME government's control). Although the burden of rebutting the presumption of government control remains on the respondent, in some circumstances Commerce may have to perform an independent investigation of the facts related to the question of government control if the parties' filings do not answer it to Commerce's satisfaction.  See Rhone-Poulenc, Inc. v. United States, 927 F. Supp. 451, 456 (CIT 1996); see also Sigma Corp. v. United States, 841 F. Supp. 1255, 1267 (CIT 1993) ("The burden of proof to show that a company is independent is on the respondent, but if it has not supplied enough information, the burden shifts to Commerce to ask for more information.").

Where, as here, Commerce has made a preliminary finding of absence of government control, Commerce must provide sufficient explanation, grounded in reasonable inferences from record evidence, to support a contrary finding. See Sigma Corp., 841 F. Supp. at 1267. Commerce, however, failed to perform any meaningful investigation of the facts related to the question of government control before issuing the initial Final Results and again by misconstruing the court's remand instructions as requiring that Commerce affirmatively demonstrate government control over Taifa. See Remand Results at 17. Commerce still has not made a final finding about the presence or absence of de jure and de facto government control over Taifa, including a finding and explanation which substantiates or rejects a sufficient link to a country-wide PRC rate. Commerce thus did not comply with the court's remand instructions to make a determination based on a proper analysis of nonmarket control. See Taifa I, 637 F. Supp. 2d at 1244. As stated previously, town or village ownership in name alone does not provide an answer. A remand is therefore necessary for Commerce to consider all evidence pertaining to Taifa's de jure and de facto independence from the PRC government and to make a determination as to whether a separate rate or a country-wide rate is warranted.

**CONCLUSION**

The court hereby remands the matter to Commerce again to determine, after proper investigation and analysis, whether a government entity exercised nonmarket control over Taifa sufficient to link the PRC-wide rate to Taifa. Commerce must provide an explanation to support its determination that addresses how Taifa's possible nominal town government ownership relates to whether a government entity exercises nonmarket control over Taifa comparable to the paradigmatic situation in which the central government of an NME country

controls its companies' pricing, export activities, and operations.[3]  Commerce's

decision—whatever it may be—must be supported by substantial evidence.  See 19 U.S.C.

§ 1516a(b)(1)(B)(i).

Commerce thus has three options on remand.  First, if Commerce determines that

Taifa is not independent of the PRC government's control based on the documents indicating

town government ownership, Commerce must explain, based on PRC law, prevailing practices in

the PRC, or other relevant information, why these particular documents are significant to the

issue of government control, how the documents ultimately link Taifa to central PRC

government control and a rate relating thereto, and why the fact that the documents indicating

the transfer of the town government's interest were not properly registered in the PRC is

significant to the issue of government control.[4]  Alternatively, if Commerce finds that the

evidence does not indicate that a government entity controlled Taifa's prices, export activities, or

operations and no ultimate link between Taifa and the rates applicable to central PRC

---

[3] Such an explanation may be particularly necessary where Commerce has recognized that, due to the PRC's "significant and sustained economic reforms," the PRC economy no longer resembles the traditional Soviet-style command economies but is more of a hybrid featuring "both a certain degree of private initiative as well as significant government intervention, combining market processes with continued state guidance."  Countervailing Duty Investigation of Coated Free Sheet Paper from the People's Republic of China—Whether the Analytical Elements of the *Georgetown Steel* Opinion are Applicable to China's Present-Day Economy, C-570-907, at 3, 7 (Mar. 29, 2007), available at http://ia.ita.doc.gov/download/nme-sep-rates/prc-cfsp/china-cfs-georgetown-applicability.pdf (last visited May 10, 2010); see also GPX Int'l Tire Corp. v. United States, 645 F. Supp. 2d 1231, 1237, 1246 n.14 (CIT 2009).

[4] Gleason and Precision have cited some documents, including Taifa's Assets Evaluation Report and a 1997 Capital Verification Certificate, which might indicate that a government entity controls Taifa's operations, but Commerce has never evaluated these documents.  If Commerce finds that these documents are relevant, it must explain why they indicate that the PRC-wide rate is appropriate.

government-controlled entities, then Commerce should conclude that Taifa has established its

independence from government control sufficient to reject a country-wide rate.  Finally, if, after

thorough investigation and analysis, Commerce finds the evidence regarding government control

of pricing, export activities, or operations and regarding Taifa's relationship to the central PRC

government in equipoise, Commerce may apply a well-supported and explained presumption

based on current conditions that Taifa is government-controlled and apply the appropriate rate.[5]

Because a remand is appropriate on the issue of government control, the court

declines to decide whether the non-PRC-wide 227.73% substitute AFA rate was supported.  If

Commerce concludes based on substantial evidence that Taifa was not government-controlled so

as to require the PRC-wide rate, Commerce must calculate a separate, substitute AFA rate for

Taifa in accordance with the standard set forth in Gallant Ocean (Thailand) Co. v. United States,

__ F.3d __, Appeal No. 2009-1282 (Fed. Cir. Apr. 16, 2010).[6]

Commerce shall file its remand determination with the court within sixty days of

---

[5] If the evidence is in equipoise, Commerce may choose the opposite result as well.
Either would be sustainable.

[6] As the court stated in Taifa I, Commerce may not apply the PRC-wide rate as the AFA
rate if Taifa has established its independence from government control because "[i]n such a
situation, there is no connection between the PRC-wide rate and an estimate of [Taifa's] actual
rate."  637 F. Supp. 2d at 1240–41.  The Court has properly rejected the notion that Commerce
may apply the PRC-wide rate as the AFA rate to respondents that qualify for separate rates
simply because the PRC-wide rate is the highest on record.  See, e.g., Gerber Food (Yunnan) Co.
v. United States, 491 F. Supp. 2d 1326, 1350–51 (CIT 2007); Gerber Food (Yunnan) Co. v.
United States, 387 F. Supp. 2d 1270, 1287–88 (CIT 2005).  Although Zhejiang DunAn Hetian
Metal Co. v. United States, Slip Op. 10-41, 2010 WL 1558343 (CIT Apr. 19, 2010), recently
affirmed the use of a petition rate, which was the highest rate in the proceeding and also
happened to be the PRC-wide rate, against a respondent that was independent of the Chinese
government, in that case, Commerce did not deny the respondent a separate rate.  Id. at *14–16.
Rather, Commerce used the rate because it determined that the rate approximated the
respondent's actual rate, and corroboration was not challenged.  Id. at *15–16.

this date.  Taifa, Gleason, and Precision have eleven days thereafter to file objections, and the

Government will have seven days thereafter to file its response.


    /s/ Jane A. Restani
        Jane A. Restani
        Chief Judge

Dated: This 12th day of May, 2010.
      New York, New York.