Slip Op 16 - 88

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| REBAR TRADE ACTION COALITION, *et al.*, | : | |
| Plaintiffs, | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| UNITED STATES, | : | Court No. 14-00268 |
| Defendant, | : | |
| and | : | |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., and HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI A.S., | : | |
| Defendant-Intervenors. | : | |

## OPINION AND ORDER

[Remanding administrative results of redetermination that rebar from Turkey was sold at less than fair value.]

Dated: September 21, 2016

*Alan H. Price*, *John R. Shane*, *Maureen E. Thorson*, and *Jeffrey O. Frank*, Wiley Rein LLP, of Washington, DC, for plaintiffs.

*Richard P. Schroeder*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of Counsel on the brief was *David W. Richardson*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Matthew M. Nolan*, *Nancy A. Noonan*, *Diana Dimitriuc Quaia*, and *Julia L. Diaz*, Arent Fox LLP, of Washington, DC, for defendant-intervenor Icdas Celik Enerji Tersane ve Ulasim, A.S.

*David J. Simon*, Law Office of David L. Simon, of Washington, DC, for defendant-intervenor Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S.

Musgrave, Senior Judge:    Slip opinion 15-130 (Nov. 23, 2015) remanded *Steel Concrete Reinforcing Bar From Turkey: Final Negative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances*, 79 Fed. Reg. 21986 (Sep. 15, 2014) ("*Final Determination*"),[1] together with its accompanying issues and decision memorandum ("*IDM*") to the U.S. Department of Commerce, International Trade Administration ("Commerce" or "Department") for reconsideration or further explanation of four aspects of those final results: (1) the decision to grant duty drawback adjustment to respondents ICDAS Celik Enerji Tersane ve Ulasim, A.S. ("Icdas") and Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. ("Habas"), in particular to account for the Turkish Resource Utilization Fund ("KKDF") tax ultimately not collected, pursuant to the Turkish Inward Processing Regime ("IPR"), on imports of raw materials incorporated into exports; (2) the calculation of the duty drawback adjustment; (3) the decision to use the date of invoice as the date of sale; and (4) a determination concerning the alloy content of Icdas's[2] steel billets. *See* Slip Op. 15-130 (Nov. 23, 2015), familiarity with which is presumed. At this point, the parties contest aspects of the remand results ("*Redetermination*"), which has yielded margins of 3.64 percent for Icdas, *de minimis* for Habas, and 3.64 percent for "all others". *See* ECF No. 77 (Apr. 7, 2016) at 71. For the following reasons, the matter must be remanded a second time.

---

[1] The period of investigation is July 2012, through June 2013.

[2] Insofar as this court is aware, Professor Strunk's First Rule is still vibrant. *See* William Strunk, Jr., and Elwyn Brooks "E.B." White, *The Elements of Style* (3rd ed. 1979), p. 1 (Rule 1: "Form the possessive singular of nouns by adding 's. Follow this rule whatever the final consonant."). Passages herein from the papers, however, are quoted unaltered for readability's sake.

*Discussion*

Concerning the first issue, Commerce previously determined that Turkey's IPR, which basically forgives the liability for customs duties owing on imported material upon export of finished product incorporating such material, functions in the manner of a customs duty drawback program similar to such regimes as exist in the United States. *See*, *e.g.*, *Redetermination* at 4. The duty drawback system of the United States, for example, permits rebate of 99 percent of the customs duties paid on imported merchandise if the exported product, *inter alia*, either consists of the imported merchandise itself, or consists of a suitable "substitute" for the imported merchandise, otherwise known as "substitution" drawback. *See* 19 U.S.C. §1313(a)&(b); 19 C.F.R. §191.22.

I. Adjustment of U.S. Price for KKDF Tax Forgiveness

The plaintiffs, Rebar Trade Action Coalition and its individual members (plaintiffs or "RTAC"), previously challenged Commerce's interpretation of the interplay between or operation of Turkey's IPR and its KKDF tax scheme and Commerce's decision to include the latter as part of the adjustment to the U.S. price of the subject merchandise required by 19 U.S.C. §1677a(c)(1)(B). The issue was remanded as necessary to Commerce's voluntary request to reconsider an aspect of its duty drawback calculation methodology. *See infra* & *generally* Slip Op. 15-130 at 5-9.

As a threshold matter, on remand Commerce reaffirmed that the respondents met the requirements of its two-prong test for duty drawback pursuant to the established framework of Turkey's IPR. *See Redetermination* at 5-6, 38-40. RTAC did not comment on that finding but argued against inclusion of the KKDF tax in the duty drawback adjustment calculation on the following grounds: (1) the KKDF tax does not qualify as a statutory "import duty" under 19 U.S.C.

§1677a(c)(1)(B) as it was not "import-dependent and export contingent"; (2) the KKDF tax is not imposed on imports but on commercial loans that are financed in certain ways, and regardless of whether those loans are used to support imports or not; (3) the KKDF tax did not qualify as an "import duty" within the meaning of section 1677a(c)(l)(B) because the KKDF tax can be avoided altogether even with respect to loans to support imports simply by avoiding certain types of financing options such as acceptance loans or loans denominated in foreign currencies; and (4) "[i]f no tax was ever owed, then it could not have either been rebated or foregone by reason of exports to the United States." *See Redetermination* at 6, 40-42.

Considering the arguments on the record,[3] Commerce again found, consistent with its previous analytic experience therewith,[4] that the KKDF tax qualifies as a statutory import duty under section 1677a(c)(1)(B) and that the tax was "import-dependent and export contingent"[5], to wit:

> The KKDF amount is considered a contingent liability similar to the duties exempted on raw materials imported under the requirements of the IPR. Therefore, we find that this contingency is tantamount to "owed duties" because such a tax would require payment absent the satisfactory exportation of the subject merchandise to the United States.

*Id*. at 14. *See also id.* at 42-45.

----

[3] As supplemented during remand. *See Redetermination* at 8-14.

[4] *Id.* at 6 n.14, referencing *Final Results of the Antidumping Duty Administrative Review: Welded Carbon Steel Standard Pipe and Tube Products from Turkey; 2012-2013*, 79 Fed. Reg. 71087 (Dec. 1, 2014), and accompanying issues and decision memorandum at comment 3, which stands for the proposition that the fact that KKDF taxes are a tax levied on financial transactions, not on goods and services, does not prevent KKDF taxes from functioning as a duty on imports.

[5] *Redetermination* at 6.

RTAC here re-emphasizes that its challenge is focused on "whether the KKDF can properly be considered an 'import duty' within the meaning of 19 U.S.C. § 1677a(c)(I)(B), given that it can be incurred on loans to support domestic purchases as well as imports, and can be avoided entirely even with regard to import financing by choosing non-taxable loans," and RTAC contends the *Redetermination* has not clarified this particular question. RTAC Cmts. at 10, citing RTAC Br. at 8-10, ECF Nos. 28, 29. Elaborating, RTAC argues Commerce's finding that "[t]he KKDF amount is based on the value of the goods themselves" (*Redetermination* at 9) is based on an incorrect interpretation of the record, which indicates that the KKDF tax is incurred from financing options and is based on the value of that financing rather than on the customs value of any relevant imported goods, which are not necessarily the same values. *Id*. at 11. "The point is important, as the agency's determination that the KKDF, when incurred in transactions involving imports, is owed on the value of the imports at issue, appears central to the agency's conclusion that the tax functions in the manner of an import duty."[6] *Id*.

---

[6] From which point, further elaborating, RTAC points to two problems with Commerce's "disagree[ment]" with its claim that the KKDF decree itself states that the tax is imposed on the value of financing and not on the value of the imports financed, to wit: (1) that Commerce had no reasonable basis for concluding that it had cited an outdated version of the KKDF decree in making its arguments when it, RTAC, citing the documentation provided in Icdas's second supplemental Section C response, pointed to the same language the agency had apparently found so pertinent -- in particular, the phrase "changed by government decree 2011/2304" in Section 7(D) of the KKDF decree -- which did not, as Commerce may have assumed, revoke or replace (as opposed to merely supplement) the decree but should, therefore, have been read in conjunction with the original decree itself; and (2) that the language Commerce apparently found pertinent -- *i.e.*, "7(D) - import by acceptance credit, term L/C and cash against goods, 6 % (changed by government decree 2011/ 2304)" -- (*see* Icdas Second Supp. C. Response at Ex. SC-14) does not in any way state that the tax is being charged on the value of imports, versus the value of import financing vehicles. RTAC Cmts. at 12-13. "In fact, when it is read in conjunction with the rest of the decree, it is clear that the tax is on the value of the financing for goods financed in certain ways, and not on the value of

(continued...)

This court is unpersuaded that Commerce has misconstrued the record. The agency's determination on the record of the meaning and operation of foreign law is one of fact, and while Commerce might just as well have been reasonably persuaded by RTAC's contentions, for purposes of its *Redetermination* the pertinent point for Commerce, as mentioned, appears to have been its finding that the KKDF taxes on this record were assessed and owing in fact due to import, whether or not imposed "on" the import(s) directly, and were therefore "tantamount to 'owed duties'" that the respondents ultimately persuaded were in fact excused or forgiven through the operation of the IPR. *See Redetermination* at 13-15. RTAC's arguments, which offer a different interpretation of *de jure* aspects of the KKDF tax, essentially amount to asking for substitution of judgment for Commerce's interpretation on that matter of fact, and they do not here persuade, thereby, that Commerce's determination to adjust U.S. price to account for KKDF tax forgiveness, pursuant to Commerce's interpretation of the actual operation of the IPR on record, resulted from unreasonable interpretation of it. *See id*. at 39-45 (cmts. 1 & 2).

## II. Modification of Duty Drawback Calculation

Undisputed is Commerce's finding that the respondents sourced some of their inputs from both foreign sources, which incurred import duties, and domestic sources, which incurred no import duties. However, in light of that fact RTAC previously argued the *Final Determination* was unclear in addressing its arguments on the calculation of the duty drawback adjustment, Commerce, in response, requested remand voluntarily in order to reconsider its duty drawback adjustment

---

[6] (...continued)
imported goods themselves", and "[i]n concluding otherwise, the agency appears to be relying solely on respondents' assertions, and ignoring the KKDF decree itself." *Id*. at 14.

calculation. On remand, Commerce concluded that application of its usual methodology resulted in a distorted margin; accordingly, it adjusted its methodology to eliminate the perceived distortion. *Redetermination* at 49-58. RTAC supports the remand results while Icdas opposes.

Commerce begins by explaining that the dumping margin, in its basic form, is expressed as a ratio of normal value ("NV") minus U.S. Price ("USP") divided by U.S. Price, or "(NV – USP) / USP"[7]. To achieve a "fair comparison",[8] 19 U.S.C. §1677a(c)(1)(B) requires upward adjustment of USP by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States". The purpose of this statutory "duty drawback adjustment" is to achieve "tax neutrality" in a comparison of NV and USP when Commerce confronts the situation where "goods sold in the exporter's domestic market are subject to import duties while exported goods are not". *Saha Thai Steel Pipe (Pub.) Co. v. United States*, 635 F.3d 1335, 1339 (Fed. Cir. 2011) ("*Saha Thai*"). In such a situation, the purpose of the statute is to equilibrate by "increasing EP to the level it likely would be absent the duty drawback" and amounts to "a plain and simple rule: a duty drawback adjustment shall be granted when, but for the exportation of the subject merchandise to the United States, the manufacturer would have shouldered the cost of an import duty." *Id.* at 1341. *See also Maverick Tube Corp. v. United States*, 40 CIT ___, 2016 WL 2844288, at *8 (May 10, 2016) (observing that the language of the statute is "plain" only to a certain extent).

---

[7] *See* Def's Resp. at 12 (court's alteration). *Cf.* 19 U.S.C. §1677(35)(A) (dumping margin). For purposes of this calculation, USP will be either export price ("EP") or constructed export price ("CEP").

[8] *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 820 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4161.

In theory, such an adjustment is unexceptional. However, the *Redetermination* explains that Commerce identified an "imbalance" in its standard duty drawback adjustment methodology:

> [O]n the NV side of the comparison, the annual average cost for an input was an average cost of both the foreign sourced input, which incur duties, and domestic sourced input on which no duties were imposed. Thus, the denominator over which the amount of the duties forgiven or rebated was allocated was all production. This per-unit amount of duties was a component of the  respondent's cost of production. On the EP/CEP side, however, the amount of duties forgiven or rebated was allocated over only the export sales quantity.  As a result, the adjustment to the EP/CEP used a smaller denominator than that used on the NV side. Thus, the per unit U.S. sales adjustment was larger than the per unit duty amount imbedded in NV, and created an imbalance in the comparison of the EP/CEP with NV.

*Redetermination* at 16.  Taking such facts into account, Commerce accordingly explained that it

> will make an upward adjustment to EP and CEP based on the amount of the duty imposed on the input and rebated or not collected on the export of the subject merchandise by properly allocating the amount rebated or not collected to all production for the relevant period based on the cost of inputs during the POI. This ensures that the amount added to both sides of the comparison of EP or CEP with NV is equitable, *i.e.*, duty neutral meeting the purpose of the adjustment as expressed in *Saha Thai*. Thus, based on the facts of this investigation, the Department finds that the import duty costs, based on the consumption of imported inputs during the POI, including imputed duty costs for the imported inputs, properly accounts for the amount of duties imposed, as required by 772(c)(1)(B) of the Act. Thus, for this remand redetermination, the Department has revised its calculation of the adjustment to EP and CEP for duty drawback such that this adjustment is based on the per-unit duty costs included in the respondent's cost of production.[  ]

*Id.* at 18-18 (footnotes omitted).

RTAC supports this recalculation of the duty drawback adjustment.  RTAC Cmts. at 2-3.  Icdas, however, argues the recalculation is inconsistent with the statute, *inter alia*, because allocating duty drawback to "all production" is a flawed premise because it "allocates a part of the duty drawback adjustment to home market sales, which could never earn duty drawback".  Icdas

Cmts. at 2. The duty drawback statute does not permit this, Icdas argues, but requires a "full" upward adjustment to EP or CEP for duties not collected "by reason of the exportation of the subject merchandise to the United States." *Id*., quoting 19 U.S.C. §1677a(c)(1)(B).

Icdas's reading of the statute appears correct, at least in part. *See Avesta Sheffield, Inc. v. United States*, 17 CIT 1212, 1216, 838 F. Supp. 608, 612 (1993) (the statute "allows a full upward adjustment" to EP for import duties "which have not been collected"); *see also Wheatland Tube Co. v. United States*, 30 CIT 42, 62, 414 F. Supp. 2d 1271, 1288 (2006) (quoting same). Commerce having determined that Icdas met the statutory requirements for the duty drawback adjustment, *see Redetermination* at 15, 39-40, the problem with the *Redeterminaion*'s modification of the per-unit "sales" side of the standard duty drawback adjustment calculation is that by conflating duties paid and duties rebated or not collected by reason of export the modification effectively disallows the full amount of the duty drawback (*i.e.*, the amount of KKDF import-tax forgiveness) allocable to EP/CEP in contravention of the statute. Thus, the court agrees with Icdas that what the *Redetermination*'s modification of the standard duty drawback adjustment does, in effect, is attribute to domestic production a part of the actual duty drawback received, and domestic production cannot, by definition, be attributed with duty drawback under Turkish law. The USP adjustment for drawback, being causally related to exportation, not production, is allocable only to the exports to which it relates; therefore, because the result of the methodology applied in the *Redetermination* apparently denies the full adjustment to EP/CEP which Icdas is lawfully entitled without adequate justification, further remand for reconsideration (and justification of any modification) is required.

That said, the court does not agree that Commerce's attempt to properly allocate the duty amount attributable to NV was based on a "flawed premise". *See* Icdas Cmts. at 12. Icdas agrees that "the whole rationale for the [c]ourt's decision in *Saha Thai* was that costs need to be increased to erase distortions that might be created by duty drawback", Icdas Cmts. at 17 (bracketing added), and the court agrees with the *Redetermination* that Commerce's standard duty drawback methodology is flawed insofar as it produces a distorted comparison of a per-unit NV with a per-unit EP/CEP when production involves a mixture of foreign-sourced and domestic-sourced inputs.

Conceptually, whereas the "cost" side of NV reflects a simple average, *i.e.*, a uniform ratio of allocated input costs across all production, the Turkish drawback system (*i.e.*, the IPR) effectively "loads" the EP/CEP export sales side with duty inclusive (foreign sourced) input production costs and correspondingly skews the proportion of the duty exclusive (domestic sourced) production costs that must, as a matter of accounting logic, remain on the NV foreign like product counterpart cost side. The operation of the IPR thus amounts to a "forced reallocation" of production costs between the EP/CEP side and the NV side, rendering inapplicable and inappropriate the calculation of a "simple" average cost of production that would otherwise cover both the export product and the domestically-sold product alike.

To take a simple example: if a respondent's production consists of 75% foreign-sourced inputs and 25% domestic-sourced inputs, and if it exports 75% of its finished product and sells the remaining 25% of its production in the domestic market, and if the respondent claims and receives 100% of the customs duties paid during the period of investigation as drawback (*i.e.*, regardless of the fact that its exports consist in fact of a fungible mix of 75% foreign-sourced inputs

and 25% domestic-sourced inputs), then under that scenario there are effectively no customs duty

costs that must be borne in sales of the domestic product, which is conceptually the comparative NV.

Under that scenario, either no duty drawback adjustment is necessary -- because USP and NV are

both "net" of the taxes with which the antidumping duty statute is concerned -- or the equivalent per-

unit "full" adjustment that is made to EP/CEP must likewise be made to the per-unit "cost" side of

NV in accordance with *Saha Thai*.  As stated in the *Redetermination*:

> if the imported raw materials are assumed to be consumed in the exported
> merchandise and the domestic purchased raw materials [ar]e presumed to be
> consumed in the domestically sold merchandise, no duty offset adjustment can be
> justified, as the NV would no longer be duty inclusive as the CAFC presumed in
> *Saha Thai*.  The duty exclusive U.S. price should then be matched directly with the
> duty exclusive Home Market price.
>
> Conversely, if the imported inputs were presumed to be consumed first in the
> products sold domestically, thus creating a duty inclusive NV, there would still be no
> justification for a duty drawback claim, as a precondition of a duty drawback is the
> consumption and subsequently re-exported as part of another good and the collection
> of the rebate.[ ] It would be nonsensical to claim a duty drawback for re-exporting
> the imported input while simultaneously claiming the same input was consumed in
> a domestically sold product. Therefore, while perhaps counterintuitive, the only
> reasonable assumption is that the imported raw materials and domestically sourced
> raw materials are consumed proportionally between the corresponding domestic sales
> and export sales, as then both the U.S. price and Home Market price will be duty
> inclusive.

*Redetermination* at 53-54.  *Cf.* 19 U.S.C. §1677b(a)(6)(B)(iii) (purpose of NV adjustment is to net

"the amount of any taxes imposed directly upon the foreign like product or components thereof

which have been rebated, or which have not been collected, on the subject merchandise, *but only to*

*the extent that such taxes are* added to or *included in the price of the foreign like product*") (italics

added).

The essence of the problem here, in accordance with *Saha Thai*, appears to be that to the extent EP/CEP "must" be adjusted to account for duty drawback in order to achieve tax neutrality, when EP/CEP is in fact adjusted upwards to account for the amount of duty drawback, it is conversely appropriate to impute the payment of import duties to the cost side of NV up to the level at which the NV cost side reflects a "mirror image" of the duties rebated or not collected by reason of import. *Saha Thai*, 635 F.3d at 1342. Thus, as far as the NV cost side of Commerce's standard duty drawback adjustment methodology is concerned, substantial evidence of record supports the *Redetermination*'s conclusion that the methodology is "imbalanced" when attempting to impute a corresponding amount of import duties to the NV cost side in the context of substitution drawback granted upon export to a product that presumptively consists of both domestic and foreign sourced inputs, and the matter must be remanded for further consideration.

In passing, the court notes for purposes of remand that the *Redetermination* is premised on "recognizing that a drawback adjustment that *overstates* the amount of duty in NV will distort a determination of dumping". *Redetermination* at 54 (italics added). As a general principle, that is true. But as to any particular solution that addresses the aforementioned imbalance occasioned by "*de jure* re-allocation" of the input-content of exported subject merchandise resulting from operation of the IPR (whereby domestic-sourced input is considered as "substituted" foreign-sourced input for drawback purposes) and whether that solution would accord the statute and *Saha Thai*, such matters are best left to Commerce and the parties to sort out on remand. Whatever avenue is chosen to correct for the perceived imbalance in the duty drawback adjustment methodology

should, of course, also address Commerce's overstatement concern as to the amount of duty properly imputable to NV by way of explanation.[9]

Also in passing, the court notes Icdas's arguments on case law clarifying that the duty drawback adjustment does not require any inquiry into whether home market prices are duty inclusive. *See*, *e.g.*, Icdas Cmts. at 20, citing *Wheatland Tube Co. v. United States*, 30 CIT 42, 61-62 (2006), *rev'd on other grounds*, 495 F.3d 1355 (Fed. Cir. 2007). The cases to which Icdas points for support, however, pre-date *Saha Thai*, and the point of law it raises is of little moment to the issue at hand. Icdas then argues that "imputed" duty costs are already "accounted for", *id*. at 22, but that point does not address *how* those costs are to be allocated, as the petitioners note, which is the issue before the court. Icdas further argues that any modification of the duty drawback adjustment methodology requires rulemaking under the Administrative Procedure Act, *id*. at 23-24, but just as a change of administrative policy "is irrelevant" because Commerce may substitute new administrative policy based on a reasonable statutory interpretation that is entitled to *Chevron* deference, *Saha Thai*, 635 F.3d at 1342, citing *Rust v. Sullivan*, 500 U.S. 173, 186-87 (1991), Commerce is also entitled to change its methodology in the absence of any reliance interest if the change is reasonably explained. *Cf. SKF USA, Inc. v. United States*, 537 F.3d 1373 (Fed. Cir. 2008)

---

[9] In the first place, for example, would imputation, to the input content of the home market NV "side," of the same domestic-to-foreign input content ratio that is implicitly embodied in exported subject merchandise receiving the benefit of IPR drawback result in overstating NV? Assuming it would not, and assuming further, for simplicity's sake, that the IPR treats 100% of the input content of exported subject merchandise as foreign-sourced, would the imbalance in the duty drawback equation be corrected on the NV cost side by, for example, "(rebated duties ÷ export quantity) + (non-rebated duties ÷ (total production − export sales quantity)) = average Turkish domestic like product import duty cost", or is there is a form of "weighted" average that would more properly impute a "like" proportion of the import duty to the NV cost side, *i.e.*, in proportion to impact of the import duty rebated or not collected by reason of export to the EP/CEP side?

*with Huvis Corporation v. United States*, 570 F.3d 1347, 1354-55 (Fed. Cir. 2009) ("[s]ometimes

an agency must provide a more detailed justification than what would suffice for a new policy

created on a blank slate, such as . . . when its prior policy has engendered serious reliance interests

that must be taken into account") (citation and internal quotes omitted). Icdas does not explain how

cost reporting is a reliance interest, but Commerce has yet to reconsider the issue in any event.

### III. Date of Sale Reconsideration

On remand of the issue of the date of sale "at least for further explanation . . . or for

reconsideration, at Commerce's discretion",[10] the *Redetermination* summarizes, first, that Commerce

> encountered a sales process that was subject to renegotiation for a significant
> percentage of U.S. sales, including renegotiated/revised terms of sales that occurred
> on the eve of the invoice date.[ ]  In other instances, Icdas and the U.S. customer
> issued a revised P/O [*i.e.*, purchase order] in which the signature blocks were left
> unsigned and the date of the amended P/O was merely penciled in at the top of the
> document.[ ]  ln our view, such facts do not point to a formal or " firmly established"
> agreement in which there is a meeting of the minds between the buyer and buyer.
> Rather, our view is that the facts indicate a fluid sales process where parties were
> able to fill out unsigned P/Os and amended P/Os that, in some instances, were
> revised multiple times right before the issuance of the invoice.[ ]  As such, we find
> that it was reasonable to conclude in the *Final Determination* that the date of the P/O
> and amended P/Os do not constitute the formal "meeting of the minds."
>
> The [c]ourt note[d] that the record lacks any evidence that Icdas' terms of sale
> were revised as of the invoice date. We do not dispute this fact. However, as
> explained in *Preamble*[11], an informal "preliminary agreement" (which in the instant
> proceeding includes instances involving unsigned P/Os with dates merely penciled
> in at the top of the document) ["]in an industry where renegotiation is common,"
> (which is certainly true in the case of Icdas), may not constitute a "meeting of the
> minds," and that this approach "holds even if, for a particular sale, the terms were not
> renegotiated." Thus, we contend that our approach in the *Final Determination* to use

---

[10] *See generally* Slip Op. 15-130 at 17-21.

[11] *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27296, 27349 (May 19, 1997).

invoice date as the date for sale for Icdas adhered to 19 CFR 351.40l(i) and the *Preamble*.

*Redetermination* at 23-24 (footnotes omitted).  The administrative analysis then distinguishes the facts of the instant matter from those of *Nucor Corp. v. United States*, 33 CIT 207, 612 F. Supp. 2d 1264 (2009), which emphasized formality in the contracting process, and from those of *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 33 CIT 695, 625 F. Supp. 2d 1339 (2009), which involved the question of whether the relevant sales contract had, in fact, changed after the contract date. *Id*. at 24-27.  Nonetheless, in light of the "holding in the *Remand Order*", *id*. at 27, for the U.S. date of sale, Commerce "under protest" used either Icdas's last amended purchase order ("P/O") date, where such information was available, or Icdas's initial P/O date. *See id*. at 27.

Icdas argues that Commerce has "misread" the court's prior decision as "requiring" Commerce to revise the date of sale.  Icdas Cmts. at 25.  Icdas is correct.  Icdas further argues Commerce's explanation on why the original determination of invoice date as Icdas's date of sale is supported by substantial evidence on the record and in accordance with law and therefore the matter should be remanded with instruction to recalculate its margin using invoice date as the date of sale.  Such instruction, however, would suffer from the same defect the defendant implicitly accuses the prior opinion in its *Redetermination* on this issue.

RTAC argues Commerce's *Redetermination* on the date of sale as of the P/O or contract or last-amended P/O or contract should be sustained; and arguably, there are grounds for doing so.  The plaintiffs note, correctly, that although Commerce continues to find meaningful the lack of formal contracts or formality involved in Icdas's sales, it is unclear why that is actually meaningful.  "The agency's duty is to determine when a meeting of the minds took place, not to

opine on the level of formality involved in the parties' documentation of that meeting." RTAC

Cmts. at 6 (citations omitted). Further, RTAC contends, while Commerce points to the *Preamble*

to its regulations in defense of its original determination, the issues alluded to in the *Preamble* do

not appear to be reasonably in play here. For example, RTAC argues, there is no reason to believe

that the terms in the last-amended PO/contracts were "merely proposed", given that Icdas and its

customers never varied in observing those terms, and while Commerce refers to such last-amended

P/Os as "preliminary agreement[s]", given that their terms were in fact observed Commerce again

seems to be solely taking issue with the level of formality involved in the parties documentation of

their final meeting of the minds, as RTAC understands the *Redetermination*. *Id*. Again, RTAC

argues, the fact that Icdas and its customers did not enter into "formal" contracts is irrelevant because

the question is when the meeting of the minds took place. *See id*. at 8. And on that issue, RTAC

argues the actual practice of the parties should speak volumes. *Id*.

As above indicated, the court sought to give Commerce wide latitude -- quite -- in

remanding this issue previously "at least for further explanation . . . or for reconsideration, at

Commerce's discretion." On the one hand, the court could simply overlook Commerce's "under

protest" pique, conclude that the *Redetermination* "adopts" the prior opinion's analysis of the issue

of the date of sale, and sustain it on that basis as supported by substantial evidence and in accordance

with law. *See*, *e.g.*, *Whirlpool Corp. v. United States*, 40 CIT ___, Slip Op. 16-81 (Aug. 26, 2016);

*Peer Bearing Company--Changshan v. United States*, 39 CIT ___, 128 F. Supp. 3d 1304 (2015).

On the other hand, since the matter requires remand of the issue of changed methodology, *supra*, the

court will also remand this date-of-sale issue without further opinion at this pont, in order to afford

Commerce the opportunity (and latitude, again) to evaluate its stated interpretation of the prior remand order and the substance of this issue afresh. *See, e.g.*, *Qingdao Taifa Group Co., Ltd. v. United States*, 34 CIT 560, 710 F. Supp. 2d 1352 (2010), *aff'd*, 467 Fed. Appx. 887 (Fed. Cir. 2012); *Acciai Speciali Terni S.p.A. v. United States*, 28 CIT 2013, 350 F. Supp. 2d 1254 (2004).

IV.  Yield Strength; Alloy Cost Allocation

Among Commerce's model match criteria for rebar is yield strength, a physical characteristic attributable to carbon equivalency.  As requested, the *Redetermination* clarifies Commerce's revision to certain yield strength CONNUMs for Habas's products and explains the information  obtained on remand for the record to support the accuracy of Icdas's reported value of of Grade S420 rebar. *See generally Redetermination* at 28-33.  As no party contests such treatment at this point, the defendant argues for sustaining this issue.

Also remanded for further explanation or reconsideration was the accounting treatment of the alloy content of Icdas's water cooled versus air cooled rebar.  Slip Op. 15-130 at 28. As Commerce explains, *see generally Redetermination* at 35-38, it sent an additional questionnaire to Icdas during remand seeking additional information relating to Commerce's understanding of Icdas's reported CONNUM-specific alloy costs among its normal books and records. Specifically, Commerce requested clarification of whether the reported alloy costs reflect actual quantities of alloys added in production, an estimate of alloys added in production based on the composition of the billets produced, or some other method. Commerce concluded from Icdas's supplemental response that its reported "product-specific" alloy costs, which are based on Icdas's normal books

and records, are not actually product-specific but rely on daily averages for alloys consumed in production, not actual product-specific consumption.

Commerce then considered whether relying on the daily average alloy cost method used in their normal books and records would be reasonable. The petitioners claimed that alloy costs should significantly differ between the different grades of billet produced, while Icdas claimed they should not. Icdas did not track such cost differences in its normal books and records and did not attempt to quantify such differences in reporting to Commerce. To assess whether Icdas's reporting method was reasonable, Commerce analyzed the amount of alloy costs allocated to each of the different internal product codes that make up the highest volume CONNUM sold in the U.S. market that was reviewed at verification. The relied-on exhibit ("CVE 7") indicated the per-unit production costs assigned to the CONNUM, by cost element, and also indicated the per-unit cost of production (in detailed cost elements) assigned to all the internal product codes that fall within the CONNUM.

Commerce found that the cost of producing the internal product codes are weight-averaged in arriving at the final CONNUM-specific cost. Among the detailed cost element fields contained in CVE 7 are alloy costs. By dividing the total alloy costs assigned to each internal product by the total production quantity of the same product, Commerce was able to determine the amount of alloy costs per unit of finished production assigned to each internal product making up the CONNUM. From this information, Commerce was then able to discern the magnitude of the differences in alloy costs assigned to the different products making up the same CONNUM; the greater the difference between the highest per-unit alloy cost and the average per-unit alloy cost, the "more likely", Commerce found, that alloy cost differences between products are not inconsequential

as contended by Icdas. Lacking record evidence to indicate the mix of products produced on any given day which factor into the daily average alloy costs assigned to each of the products, Commerce found it reasonable to conclude that discerning significantly different alloy costs assigned to the different products falling within the same CONNUM is the result of the existence of differences in the mix of billet grades produced and the existence of a meaningful difference in alloy costs between the grades of billets produced. Commerce found the difference between the highest per-unit alloy cost and the average per-unit alloy cost not inconsequential, as the calculation represents the difference in alloy costs for products that fall within the same CONNUM.

Commerce thus found that the reported product-specific alloy cost information is unreasonable, that an adjustment is warranted, and that necessary information is not available on the record. *See* 19 U.S.C. §1677e. Commerce used the alloy cost information contained in CVE 7 as "facts available", *see id.*, to calculate an adjustment to alloy costs. Specifically, using the internal product codes' detailed cost information, Commerce calculated the difference between the highest per-unit alloy cost and the average per-unit alloy cost assigned to the CONNUM expressed as a percentage of the CONNUM's total direct material costs, and it applied the resulting percentage to the reported total per-unit direct material costs for all CONNUMs, thus increasing the total cost of manufacturing accordingly. Commerce found that this was the most reasonable manner for adjusting for the difference in light of the fact that the actual difference in alloy costs is not available from the company's books and records.

Icdas opposes Commerce's *Redetermination* on this issue, noting that Commerce's standard questionnaire specifically envisions that allocations will be necessary to report costs, such

as in instances where a company's normal books and records do not track certain costs on a product-specific basis, and that Commerce "often" accepts allocations of costs on a weight basis and finds it reasonable. Icdas Cmts. at 28, referencing *Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom*, 74 Fed. Reg. 44819 (Aug. 31, 2009) (final results), and accompanying issues and decision memorandum at 40. Icdas implies Commerce should have done so here, and that the *Redetermination* has resulted in only a "modest" difference in alloy costs. Should the court consider the *Redetermination* on this issue reasonable, however, Icdas asks that the matter be remanded nonetheless "to correct [Commerce's] calculation, if needed, so that any adjusted/attributed alloy costs applied do not exceed total alloy costs incurred during the POI." *Id*. at 28-29.

Icdas's substantive arguments do not persuade that the *Redetermination* on the issue of alloy cost allocation is unreasonable. Commerce has provided a careful and detailed explanation of its consideration of the issue, and the court may not substitute judgment therefor in the absence of unreasonably-applied logic or an unreasonable interpretation of the record. The court will not, however, at this time sustain the *Redetermination* on this issue, in order to afford Commerce an opportunity to consider Icdas's argument on whether "correction" to cap the adjusted/attributed alloy costs so that they do not exceed total alloy costs incurred during the POI is appropriate. If error is manifest but has *de minimis* impact on the margin, that is harmless, but where the difference is "on the line" between a negative and an affirmative determination of sales at less than fair value, correction for precision is required; otherwise, it is encouraged where only a modicum of administrative resources is necessary therefor.

*Conclusion*

The quality of the briefing obviates Icdas's motion for oral argument, ECF No. 105, which is hereby denied as moot, and in view of the above opinion, the case must again be, and hereby is, remanded for further proceedings not inconsistent with this decision. Remand results shall be due November 23, 2016, after the filing of which the parties shall again confer and file a joint status report by November 30, 2016 or, if filed earlier, five business days of such filing in order to propose dates for filing comments and/or concerning any other matters.

**So ordered**.

/s/ R. Kenton Musgrave, Senior Judge
R.  Kenton Musgrave, Senior Judge

Dated: September 21, 2016
       New York, New York