Barnett, Judge:
This matter is before the court following the U.S. Department of Commerce's ("Commerce" or the "agency") redetermination upon court-ordered remand. See Confidential Final Results of Redetermination Pursuant to Remand ("Remand Redetermination"), ECF No. 105.
Plaintiff Eregli Demir ve Çelik Fabrikalari T.A.S. ("Erdemir") and Consolidated Plaintiffs Çolakoglu Metalurji A.S. and Çolakoglu Dis Ticaret A.S. (together, "Çolakoglu") each challenged certain aspects of Commerce's final determination in the sales at less than fair value investigation of certain hot-rolled steel flat products from the Republic of Turkey. See Certain Hot-Rolled Steel Flat Products from the Republic of Turkey, 81 Fed. Reg. 53,428 (Dep't Commerce Aug. 12, 2016) (final determination of sales at less than fair value; 2014-2015) ( "Final Determination" ), ECF No. 41-1, and accompanying Issues and Decision Mem., A-489-826 (Aug. 4, 2016), ECF No. 41-3, as amended by Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom, 81 Fed. Reg. 67,962 (Dep't Commerce Oct. 3, 2016) (am. final affirmative antidumping determinations for Australia, the Republic of Korea, and the Republic of Turkey and antidumping duty orders), ECF No. 41-2;[1]
*1328 Summons, ECF No. 1 (Erdemir); Summons, ECF No. 1, Court No. 16-00232 (Çolakoglu); Order (Jan. 1, 2017), ECF No. 45 (consolidating Court Nos. 16-00218 and 16-00232 under lead Court No. 16-00218).[2] Erdemir challenged Commerce's determinations regarding its home market and U.S. dates of sale. See Pl.'s Mem. in Supp. of Mot. of PI. Eregli Demir ve Çelik Fabrikalari T.A.Q., for J. Upon the Agency R. Pursuant to Rule 56.2, ECF No. 52-1. Çolakoglu challenged Commerce's determinations regarding duty drawback, indirect selling expenses, corrections to international ocean freight expenses, cost-averaging methodology, and treatment of excess heat as a co-product. See Confidential Pls. Çolakoglu Metalurji A.S. and Çolakoglu Dis Ticaret A.S. Mem. of Law in Supp. of Mot. for J. on the Agency R. Pursuant to Rule 56.2, ECF No. 53-1.
On March 22, 2018, the court remanded Commerce's Final Determination with respect to Erdemir's home market date of sale; the denial of Çolakoglu's duty drawback adjustment; and the rejection of Çolakoglu's corrections to its international freight expenses. See Eregli Demir ve Celik Fabrikalari T.A.S v. United States ("Erdemir" ), 42 CIT ----, 308 F.Supp.3d 1297 (2018).[3] The court sustained Commerce's Final Determination in all other respects. See id. at 1304.
On July 20, 2018, Commerce filed its Remand Redetermination. Therein, Commerce revised its date of sale determination for Erdemir's home market sales; granted Çolakoglu's duty drawback adjustment; and provided additional evidence and explanation supporting its rejection of Çolakoglu's corrections to international freight expenses. See Remand Redetermination at 1, 5-24.
Çolakoglu filed comments opposing Commerce's method of calculating its duty drawback adjustment and continued rejection of its freight expense corrections. See Confidential Consol. Pls. Çolakoglu Metalurji A.S. and Çolakoglu Dis Ticaret A.S.'s Comments on Remand Redetermination ("Çolakoglu's Comments"), ECF No. 108. Defendant United States ("Defendant" or the "Government") and Defendant-Intervenors filed comments in support of the Remand Results. See Confidential Def.'s Resp. to Comments on Remand Redetermination ("Def.'s Resp."), ECF No. 111; Def.-Ints.' Comments in Supp. of Remand Results ("Def.-Ints.' Resp."), ECF No. 110.[4]
For the reasons discussed herein, Commerce's duty drawback adjustment is remanded for further consideration. Commerce's rejection of Çolakoglu's corrections to international freight expenses is sustained.
*1329 JURISDICTION AND STANDARD OF REVIEW
The court has jurisdiction pursuant to § 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[5] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order." SolarWorld Ams., Inc. v. United States, 41 CIT ----, ----, 273 F.Supp.3d 1314, 1317 (2017) (quoting Xinjiamei Furniture (Zhangzhou ) Co., Ltd. v. United States, 38 CIT ----, ----, 968 F.Supp.2d 1255, 1259 (2014) (internal quotation marks omitted).
DISCUSSION
I. Duty Drawback
A. Legal Framework
To determine whether the subject merchandise is being sold at less than fair value, Commerce compares the export price ("EP") or constructed export price ("CEP")[6] of the subject merchandise to its normal value ("NV"). See generally 19 U.S.C. § 1673 et seq. Generally, an antidumping duty is the amount by which the normal value of a product-generally, its price in the exporting country-exceeds export price, as adjusted. See id. § 1673. One of the adjustments Commerce makes to export price pursuant to 19 U.S.C. § 1677a(c) is known as the "duty drawback adjustment." Specifically, Commerce will increase export price by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." Id. § 1677a(c)(1)(B).
This statutory duty drawback adjustment is intended to prevent the dumping margin from being distorted by import taxes that are imposed on raw materials used to produce subject merchandise, but which are rebated or exempted from payment when the subject merchandise is exported to the United States. See Saha Thai Steel Pipe (Public ) Co. Ltd. v. United States, 635 F.3d 1335, 1338 (Fed. Cir. 2011) ; Wheatland Tube Co. v. United States, 30 CIT 42, 60, 414 F.Supp.2d 1271, 1286 (2006), rev'd on other grounds, 495 F.3d 1355 (Fed. Cir. 2007). The adjustment accounts for the fact that producers are subject to the import duty when merchandise is sold in the home market, "which increases home market sales prices and thereby increases [normal value]." Saha Thai, 635 F.3d at 1338. The statute increases constructed export price "to the level it likely would be absent the duty drawback" to prevent the absence of import duties from generating or increasing any dumping margin. Id.
Commerce has developed a two-prong test to determine whether a respondent is entitled to a duty drawback adjustment: "first, ... that the exemption from import duties is linked to the exportation of subject merchandise; and second, that there were sufficient import duties incurred on the imported raw material to account for the amount of duty drawback received *1330 upon the exports of the subject merchandise." Remand Redetermination at 6; see also Saha Thai, 635 F.3d at 1340 (affirming the lawfulness of Commerce's two-prong test).
On remand, Commerce determined that Çolakoglu had demonstrated its entitlement to the duty drawback adjustment. Remand Redetermination at 10-11.[7] At issue, however, is Commerce's method of calculating the adjustment.
B. Commerce's Calculation Methodology
Until recently, Commerce calculated the duty drawback adjustment to U.S. price (referred to as the sales-side adjustment) by dividing rebated or exempted duties by total exports and adding the resultant per unit duty burden to EP/CEP. See Rebar Trade Action Coalition v. United States ("RTAC I "), Slip Op. 15-130, 2015 WL 7573326, at *4 (CIT Nov. 23, 2015) (granting Commerce's request for a voluntary remand to reconsider the sales-side adjustment methodology as set forth in the Issues and Decision Mem. for the Final Negative Determination in the Less than Fair Value Investigation of Steel Concrete Reinforcing Bar from Turkey, A-489-818 (Sept. 8, 2014) ("Rebar from Turkey Mem.") ).
When producers participate in a duty exemption program, Commerce also makes a corresponding upward adjustment to the cost of production ("COP") and constructed value ("CV") (referred to as the cost-side adjustment)[8] to account for the cost of the unpaid import duties for which the producer remains liable until the merchandise containing the dutiable input(s) is exported and the exemption program requirements are satisfied. See Saha Thai, 635 F.3d at 1341-44. In affirming Commerce's inclusion of implied duty costs in its calculations, the Saha Thai court reasoned that the purpose of the statutory increase to EP/CEP "is to account for the fact that the import duty costs are reflected in ... home market sales prices[ ] but not ... sales prices in the United States[ ]." Id. at 1342. Thus, "[i]t would be illogical to increase EP to account for import duties that are purportedly reflected in NV, while simultaneously calculating NV based on a COP and CV that do not reflect those import duties." Id. Accordingly, "[u]nder the 'matching principle,' EP, COP, and CV should be increased together, or not at all."[9] Id. at 1342-43.[10]
In 2016, on remand pursuant to RTAC I , Commerce modified its sales-side adjustment by allocating exempted duties over total production instead of exports. See *1331 Rebar Trade Action Coalition v. United States ("RTAC II "), Slip Op. 16-88, 2016 WL 5122639, at *3 (CIT Sept. 21, 2016) ; Final Results of Redetermination Pursuant to Court Remand, A-489-818 (Apr. 7, 2016), available at http://ia.ita.doc.gov/remands/15130.pdf (last visited Dec. 19, 2018) ("Rebar from Turkey Remand Mem."). Commerce developed this methodology in response to arguments by domestic producers regarding distortions in the margin calculations that may arise when the respondent uses fungible inputs both from foreign sources, which incur import duties, and domestic sources, which do not. See RTAC II, 2016 WL 5122639, at *3-4. Commerce claimed that adhering to its prior methodology generated "distortions" in the margin calculations because the larger denominator on the cost-side resulted in a smaller adjustment to normal value than U.S. price. Id. at *3 (citing Rebar from Turkey Remand Mem. at 16). Thus, according to Commerce, equalizing the denominators used in each adjustment "ensure[d] that the amount added to both sides of the comparison of EP or CEP with NV is equitable, i.e., duty neutral[,] meeting the purpose of the adjustment as expressed in Saha Thai ." Id. at *4 (citing Rebar from Turkey Remand Mem. at 18).
In subsequent administrative proceedings involving respondents that source inputs from foreign and domestic suppliers, including Çolakoglu here, Commerce has applied its modified sales-side adjustment. See Remand Redetermination at 12, 20-23; cf. Issues and Decision Mem. for the Final Determination of the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from India, A-533-863 (May 24, 2016) at 7-11, available at https://enforcement.trade.gov/frn/summary/india/2016-12986-1.pdf (last visited Dec. 19, 2018); Issues and Decision Mem. for the Final Results of Antidumping Duty Admin. Review: Welded Carbon Steel Standard Pipe and Tube Products from Turkey; 2014-2015, A-489-501 (Dec. 12, 2016) at 5-6, available at https://enforcement.trade.gov/frn/summary/turkey/2016-30541-1.pdf (last visited Dec. 19, 2018). In the underlying proceeding, Commerce divided Çolakoglu's exempted duties by the POI total cost of manufacturing subject hot-rolled steel products to derive a drawback ratio. Remand Redetermination at 21; Am. Final Calculation Mem. for Çolakoglu (June 28, 2018) ("Çolakoglu Calc. Mem.") at 3, CRR 11, PRR 6, CRJA Tab 20, PRJA Tab 20. Commerce applied that ratio to the CONNUM-specific cost of manufacturing "to calculate the amount of imputed import duties" to be added to Çolakoglu's cost of production. Remand Redetermination at 21; Çolakoglu Calc. Mem. at 3.[11] Commerce subsequently capped Çolakoglu's upward adjustment to export price "by the amount of the import duties included in the [cost of production]." Remand Redetermination at 21; Çolakoglu Calc. Mem. at 3-4. In so doing, Commerce reiterated the need for an "equitable, i.e., duty neutral" comparison of export price with normal value to maintain consistency "with the purpose of the adjustments as affirmed in Saha Thai ." Remand Redetermination at 12 & n. 56 (citing Saha Thai, 635 F.3d at 1344 ).[12]
*1332 In response to Çolakoglu's argument that 19 U.S.C. § 1677a(c)(1)(B) requires Commerce to allocate exempted duties over total exports regardless of the source of the inputs, Commerce noted the statute's lack of an explicit allocation methodology and its corresponding discretion in that regard. Id. at 21-22. Commerce further noted that, pursuant to its "normal costing methodology, the cost to produce a given product is [ ] the same, regardless of whether the product is sold domestically or is exported." Id. at 22.
C. Parties' Contentions
Çolakoglu contends that Commerce's modified sales-side adjustment is unlawful because it attributes some of the adjustment to home market sales, in contravention of the statutory linkage between the adjustment and exported merchandise, and lessens the full upward adjustment to which it is entitled. Çolakoglu's Comments at 4-6, 10. Çolakoglu further contends that Commerce's reliance on Saha Thai to support the modified sales-side adjustment as ensuring a "duty neutral" approach is misplaced. Id. at 8-9.
The Government contends that Commerce's calculation of the duty drawback adjustment represents a permissible construction of the statute, which is silent on the issue of allocation. Def.'s Resp. at 9-10, 12. According to the Government, "[h]ad Congress intended to limit Commerce's discretion in performing the EP/CEP duty drawback calculation, ...the statute would provide that for each unit of subject merchandise exported, the EP/CEP shall be increased by the amount of duty rebated or not collected on that unit." Id. at 10. While recognizing that Saha Thai "does not address allocation," the Government contends that the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") "endorsed the concept of a 'matching principle,' which would ensure [duty] neutrality by requiring equal adjustments to both the NV and EP/CEP sides of the equation." Id. at 11 (citing Saha Thai, 635 F.3d at 1342-43 ). The Government further contends that "Çolakoglu ignores the distortions" to the margin calculations that occur "when respondents use a mix of foreign and domestic [inputs]." Id. at 13; see also id. at 9 ("Çolakoglu suggests that it is statutorily entitled to a distorted margin calculation.").
Defendant-Intervenors likewise contend that the statute is silent as to how Commerce should calculate the adjustment and contend that examination of the statute's purpose and context confirms that the agency's interpretation is reasonable. Def.-Int.'s Resp. at 6. Defendant-Intervenors further contend that "granting a full upward adjustment to EP/CEP ... would result in an inequitable comparison [with] normal value." Id. at 7.[13]
D. Commerce's Methodology is Remanded
Commerce relies on the purported statutory silence regarding the way it *1333 must calculate the duty drawback adjustment to support its discretionary decision to allocate exempted duties over total production. See Remand Redetermination at 21; cf. Def.'s Resp. at 9-10, 12; Def.-Int.'s Resp. at 6. The court's review of Commerce's interpretation and implementation of a statutory scheme is guided by Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1322, 1329 (Fed. Cir. 2017). First, the court must determine "whether Congress has directly spoken to the precise question at issue." Id. (quoting Chevron, 467 U.S. at 842, 104 S.Ct. 2778 ). If Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress." Id. (quoting Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778 ). Only "if the statute is silent or ambiguous," must the court determine whether the agency's action "is based on a permissible construction of the statute." Id. (quoting Chevron, 467 U.S. at 843, 104 S.Ct. 2778 ).
The court has thrice rejected Commerce's allocation of foregone duties over total production as inconsistent with the statutory linkage between those duties and exported merchandise. See Tosçelik Profil ve Sac Endüstrisi A.S. v. United States, 42 CIT ----, ----, 321 F.Supp.3d 1270, 1275-78 (2018) (Commerce's adjustment "fails to adequately connect the adjustment to duties forgiven 'by reason of' the products' exportation to the United States"); Uttam Galva Steels Limited v. United States, 42 CIT ----, ----, 311 F.Supp.3d 1345, 1355 (2018) (same); RTAC II, 2016 WL 5122639 at *4 (the duty drawback adjustment, "being causally related to exportation, not production, is allocable only to the exports to which it relates"). The court agrees that Commerce's modified sales-side adjustment contravenes the plain language of the statute.[14]
As noted, section 1677a(c)(1)(B) requires Commerce to increase "export price and constructed export price" by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(1)(B) (emphasis added). Congress, thus, clearly intended the adjustment to capture the amount of duties Çolakoglu would have paid on its export sales but for the exportation of that merchandise. Allocating Çolakoglu's exempted duties over total production "contravenes the plain language of 19 U.S.C. § 1677a(c)(1)(B)" because it attributes some of the drawback to domestic sales, which do not earn drawback, and fails to adjust export price by the amount of the import duties exempted by reason of exportation. See Tosçelik, 321 F.Supp.3d at 1278. In other words, instead of calculating the amount of the adjustment on the basis of duties foregone solely in relation to the exported merchandise eligible for drawback, as the statute requires, Commerce has calculated an amount that is based on the distribution of some of the exempted duties to domestic sales, which is contrary to the statute's plain language.
Even if the statute was ambiguous, as Commerce contends, by lacking a more explicit methodology, Commerce must "exercise [ ] its gap-filling authority" in a "reasonable" manner. See Apex Frozen Foods, 862 F.3d at 1330 (citing Chevron, 467 U.S. at 843-44, 104 S.Ct. 2778 ). Commerce's *1334 exercise of any discretionary authority it has in this regard was unreasonable because it substantively departed from the guidance Congress did provide by decoupling the amount of the adjustment from duties forgiven solely on exported merchandise. See Ningbo Dafa Chem. Fiber Co., Ltd. v. United States, 580 F.3d 1247, 1253 (Fed. Cir. 2009) (an agency's statutory interpretation is unreasonable when it is "manifestly contrary" to the statutory terms) (citation omitted).[15]
Commerce's-and, by extension, the Government's-reliance on Saha Thai is also misplaced. See Remand Redetermination at 12; Def.'s Resp. at 11. In Saha Thai , the Federal Circuit approved Commerce's decision to utilize the cost-side adjustment in conjunction with its original sales-side adjustment to ensure that normal value and U.S. price are compared on a mutually-duty-inclusive basis. See 635 F.3d at 1342 (finding that Commerce "reasonably decided" to accompany an increase to EP with a "corresponding increase to COP and CV" because "[i]t would be illogical to increase EP to account for import duties that are purportedly reflected in NV, while simultaneously calculating NV based on a COP and CV that do not reflect those import duties"); see also id. at 1342-43 ("Under the 'matching principle,' EP, COP, and CV should be increased together, or not at all."). The Federal Circuit never stated or otherwise inferred that the adjustments to EP/CEP and normal value must be "equal," Def.'s Resp. at 11, in order to render the comparison between U.S. price and normal value "duty neutral," Remand Redetermination at 12. Commerce's interpretation of the Federal Circuit's discussion of duty inclusivity to espouse such a position, which would neutralize the duty drawback adjustment, goes further than the opinion supports and is inconsistent with the purpose of the statute. Accordingly, this issue is remanded to the agency to revise its calculation of the duty drawback adjustment using exports as the denominator rather than total production.[16]
*1335 II. Corrections to International Freight Expenses
A. Commerce's Redetermination
On remand, Commerce reopened the record and requested additional information from Çolakoglu in order to re-evaluate whether its corrections constituted "minor corrections to its reported international freight expenses." Id. at 13 & n. 63 (citation omitted). Çolakoglu responded that although it had initially "reported the gross amount of the international freight charges, ... in preparation for verification, [it] ... noted that certain international freight invoices had been discounted." Id. at 14 & n. 64 (citing Çolakoglu's Resp. to Dep't's Suppl. Questionnaire (June 1, 2018) ("Çolakoglu's Suppl. QR"), CRR 1-9, PRR 4, CRJA Tab 18, PRJA Tab 18). Çolakoglu identified the number of international freight invoices containing discounts and the corresponding decrease in freight expenses, the number of affected U.S. sales, and the volume of affected subject merchandise. Id. at 14.[17]
Commerce determined that Çolakoglu's corrections did not meet the criteria for the type of information the agency accepts at verification, to wit, (1) information, the need for which "was not evident previously"; (2) information that "makes minor corrections to information already on the record"; or (3) "information [that] corroborates, supports, or clarifies" existing record information. Id. at 14 & n.68 (citation omitted). Commerce based its determination that the corrections were not minor on the number of affected sales, the "amount of new factual information" required to review the corrections, and that implementation of the corrections would require Commerce "to ascertain which of the ... corrected invoices affected each of the ... POI sales."[18] Id. at 14-15, 24. With regard to the first and third criteria, Commerce explained that "the need for information regarding Çolakoglu's international freight expenses was apparent when [it] submitted its initial ... questionnaire response," and the "corrections do not corroborate, support, or clarify" existing information but, rather, should have been included in the initial questionnaire response. Id. at 14-15. Commerce stated that it "applied the same standard to each correction presented by Çolakoglu at verification," regardless of whether the correction would increase or decrease the margin. Id. at 24.
B. Parties' Contentions
Çolakoglu contends that the international freight corrections were minor because the discounts represented a small percentage of its total freight costs and total U.S. sales.[19] Çolakoglu's Comments at 13.[20] Defendant *1336 contends that incorporating the corrections would have required Commerce to trace discounts omitted from certain invoices to the affected sales and, thus, Commerce correctly concluded the corrections were not minor. Def.'s Resp. at 15-16. Defendant-lntervenors contend that Çolakoglu's questionnaire responses on remand demonstrate that the corrections were not minor. Def.-Ints.' Resp. at 10.
C. Commerce's Redetermination is Sustained
In determining whether Commerce's decision is supported by substantial evidence, the court "may not reweigh the evidence or substitute its own judgment for that of the agency." Usinor v. United States, 28 CIT 1107, 1111, 342 F.Supp.2d 1267, 1272 (2004). Although Çolakoglu seeks to direct the court to the minimal sums representing the discounts as a percentage of Çolakoglu's total freight costs and total U.S. sales, see supra note 19, the court's standard of review asks whether the basis for Commerce's decision-the number of affected sales and the need to trace discounts contained in particular invoices to those sales-represents substantial evidence that the corrections were not minor. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Huaiyin Foreign Trade Corp. (30 ) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) ). It "requires more than a mere scintilla," but "less than the weight of the evidence." Nucor Corp. v. United States, 34 CIT 70, 72, 675 F.Supp.2d 1340, 1345 (2010) (quoting Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004) ). Commerce's determination is supported by substantial evidence.
Çolakoglu reported its international freight expenses "on a transaction specific basis" for direct U.S. sales and sales made through Medtrade, Inc ("Medtrade"). Çolakoglu's Suppl. QR at 7. Several invoices applicable to each type of sale contained varying discounts. See id.[21] Making the corrections would have required Commerce to match each affected transaction to particular invoices and their respective discounts. See Remand Redetermination at 14-15, 24. The number of affected sales and variations in the discounts affecting those sales provide substantial evidentiary support for Commerce's decision that the corrections were not minor. Accordingly, Commerce's redetermination on this issue is sustained.
CONCLUSION AND ORDER
In accordance with the foregoing, it is hereby
ORDERED that Commerce's Remand Redetermination is remanded for reconsideration regarding the agency's calculation of Çolakoglu's duty drawback adjustment, as set forth in Section I; it is further
ORDERED that Commerce's Remand Redetermination is sustained with respect to the agency's rejection of Çolakoglu's international freight corrections, as set forth in Section II; it is further *1337 ORDERED that Commerce shall file its second remand redetermination on or before April 3, 2019; it is further
ORDERED that subsequent proceedings shall be governed by USCIT Rule 56.2(h) ; and it is further
ORDERED that any comments or responsive comments must not exceed 5,000 words.

The administrative record filed in connection with the Final Determination is divided into a Public Administrative Record ("PR"), ECF No. 41-4, and a Confidential Administrative Record ("CR"), ECF No. 41-5. The administrative record filed in connection with the Remand Redetermination is likewise divided into a Public Remand Record ("PRR"), ECF No. 107-2, and a Confidential Remand Record ("CRR"), ECF No. 107-3. Çolakoglu filed joint appendices containing record documents filed in Parties' remand briefs. See Non-Confidential J.A. to Comments and Reply Comments on Remand ("PRJA"), ECF No. 117; Confidential J.A. to Comments and Reply Comments on Remand ("CRJA"), ECF No. 116. The court references the confidential versions of the relevant record documents and briefs, if applicable, throughout this opinion.

The relevant period of investigation ("POI") is July 1, 2014, to June 30, 2015. Final Determination, 81 Fed. Reg. at 53,428.

Erdemir presents background information on this case, familiarity with which is presumed.

Defendant-Intervenors did not oppose Commerce's home market date of sale redetermination favorable to Erdemir. Accordingly, this opinion addresses issues relevant solely to Çolakoglu.

All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the U.S. Code are to the 2012 edition, unless otherwise stated.

U.S. price may consist of an export price or a constructed export price. Because the distinctions between export price and constructed export price are not at issue in this case, the court will refer only to export price. Such references, however, may be understood as including constructed export price.

Pursuant to Turkish law, Çolakoglu may be exempted from the payment of import duties (or receive a refund of duties paid) on certain inputs used in the production of (exported) subject merchandise. See Questionnaire Resp. of Çolakoglu to Suppl. Sec. D of the U.S. Dep't of Commerce Antidumping Duty Questionnaire (Feb. 8, 2016), Ex. SD-32, CR 248-67, PR 218-20, CRJA Tab 4, PRJA Tab 4.

Commerce calculates normal value using sales in the home market that are at or above the cost of production. 19 U.S.C. § 1677b(b)(1). When there are no such sales, Commerce calculates normal value "based on the constructed value of the merchandise." Id. The cost of production includes "the cost of materials and of fabrication or other processing" used in manufacturing; "selling, general, and administrative expenses"; and the cost of packaging. Id. § 1677b(b)(3). Constructed value includes similar expenses and an amount for profit. Id. § 1677b(e).

The "matching principle" is "the basic accounting practice whereby expenses are matched with benefits derived from them." Saha Thai, 635 F.3d at 1342 (citation omitted).

Çolakoglu does not challenge Commerce's application of the cost-side adjustment.

"A 'CONNUM' is a control number assigned to materially-identical products to distinguish them from non-identical, i.e., similar, products." Erdemir, 308 F.Supp.3d at 1321 n. 34 (citation omitted).

Commerce asserted that it granted the duty drawback adjustment "consistent with [its] practice." Remand Redetermination at 11 & n. 54 (citing Rebar from Turkey Mem. at Comment 1, accompanying Steel Concrete Reinforcing Bar from Turkey, 79 Fed. Reg. 54,965 (Dep't Commerce Sept. 15, 2014) (final neg. determination of sales at less than fair value and final determination of critical circumstances) ). As noted, however, Commerce applied its original sales-side adjustment in that determination. See RTAC I, 2015 WL 7573326, at *4.

Defendant-Intervenors also support their argument by way of reference to certain aspects of the Turkish duty drawback regime. See Def.-Int.'s Resp. at 6-7. Commerce, however, did not discuss or rely on these provisions to support its determination. Accordingly, the court does not address them. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (barring the court from accepting "post hoc rationalizations for agency action," and noting that it may only sustain the agency's decision "on the same basis articulated in the order by the agency itself").

While these opinions are not binding on this court, see Algoma Steel Corp. v. United States, 865 F.2d 240, 243 (Fed. Cir. 1989), the court may nevertheless consult the reasoning contained therein to the extent that it is persuasive.

While Commerce regularly uses the term "distortion" to describe the margin effect of using only exports as the denominator, Commerce's assertion is unaccompanied by any analysis to demonstrate the alleged distortion. The court might infer that the use of the term implies an assumption that the cost of the domestically-sourced input approximates the import duty-exclusive cost of the foreign-sourced input. Commerce has not, however, provided any support for this assumption. It stands to reason, moreover, that a domestic supplier of a particular input that incurs duties when imported from a foreign supplier would price its product at a level competitive with the duty-inclusive cost of the imported input. In such a scenario, it is difficult to understand the margin effect of a proper duty drawback adjustment as distortive.

Çolakoglu urges the court to constrain Commerce on remand from implementing a methodology utilized in the remand redetermination pursuant to Uttam Galva, 311 F.Supp.3d at 1355. See Çolakoglu's Comments at 10-12 & Attach. 1. Defendant and Defendant-Intervenors oppose the request. See Def.'s Resp. at 14-15; Def.-Int.'s Resp. at 8-9. Çolakoglu's request is premature in that it seeks the court's opinion on a methodology that Commerce might not apply on remand and without the benefit of Commerce's reasoning to justify, if possible, such an adjustment. Such an opinion would, moreover, amount to an impermissible advisory opinion because the court would be opining on matters outside the scope of the instant case and controversy. See United States v. Fruehauf, 365 U.S. 146, 157, 81 S.Ct. 547, 5 L.Ed.2d 476 (1961) ; Verson, A Div. of Allied Prods. Corp. v. United States, 22 CIT 151, 153-54, 5 F.Supp.2d 963, 966 (1998) ("[A] federal court does not have the power to render an advisory opinion on a question simply because [it] may have to face the same question in the future.") (internal quotation marks and citations omitted). Accordingly, the court declines Çolakoglu's request.

Specifically, Çolakoglu explained that [ [ ] ] out of [ [ ] ] international ocean freight invoices contained discounts that decreased Çolakoglu's reported expenses from [ [ ] ] U.S. dollars to [ [ ] ] U.S. dollars, and those discounts affected [ [ ] ] out of [ [ ] ] U.S. sales for the period of investigation, which corresponded to [ [ ] ] out of [ [ ] ] metric tons of subject merchandise. Remand Redetermination at 14 & nn. 65-67 (citing Çolakoglu's Suppl. QR at 8-9).

Commerce noted that "more than 50 [percent] of the invoices individually contained mistakes," affecting more than [ [ ] ] percent of U.S. sales. Id. at 14-15. Making those corrections would require Commerce to match each of the [ [ ] ] corrected invoices to "each of the [ [ ] ] POI sales." Id. at 24.

The discounts represented [ [ ] ] percent of Çolakoglu's total freight costs and [ [ ] ] percent of total U.S. sales value. Çolakoglu's Comments at 13 & nn. 4-5 (setting forth the equations resulting in the aforementioned percentages) (citations omitted).

Çolakoglu also implies that Commerce's refusal to accept the corrections was unreasonable and arbitrary because the agency accepted corrections that increased Çolakoglu's dumping margin yet refused to accept a correction that would reduce the margin. Id. at 13. Çolakoglu fails, however, to point to record evidence supporting this speculative assertion.

[ [ ] ] invoices pertaining to direct sales and [ [ ] ] invoices pertaining to Medtrade sales contained discounts. Çolakoglu's Suppl. QR at 8. For direct sales, the discounts ranged from [ [ ] ] U.S. dollars per metric ton. Id. For Medtrade sales, the discounts ranged from [ [ ] ] U.S. dollars per metric ton. Id.